**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**JAMES E. BILLIOT**                                                              **PETITIONER**

**VS.**                                                              **CIVIL ACTION NO. 1:86CV549TSL**

**CHRISTOPHER B. EPPS, Commissioner,**
**Mississippi Department of Corrections and**
**LAWRENCE KELLY, Superintendent,**
**Mississippi State Penitentiary**                                                              **RESPONDENTS**

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on the Motion of Petitioner to Determine Competency to be Executed while Being Treated with Anti-Psychotic Medication and Request for *Ford/Panetti* Competency Hearing Date. The court held a hearing on this Motion on June 25-26, 2009, at which the parties presented evidence and testimony regarding James Billiot's current mental state. Having heard the testimony and reviewed the exhibits and pleadings submitted by counsel, the court is of the opinion, for the reasons that are more fully set forth below, that Billiot has established that his mental condition has deteriorated to a point where he can not be executed under Eighth Amendment standards. Therefore, he is entitled to habeas relief on this issue.

## HISTORY

James Billiot has been convicted of capital murder in the deaths of his mother, stepfather and half-sister, which occurred in November 1981. He has been sentenced to death. His initial Petition for Writ of Habeas Corpus was filed in this court in May 1986, claiming, among other things, that he was incompetent to be executed by reason of insanity. A month later, the United States Supreme Court issued its opinion in *Ford v. Wainwright*, 477 U.S. 399 (1986), holding that the Eighth Amendment prohibits execution of the insane. In light of *Ford*, this court held the petition in

abeyance until Billiot could exhaust his insanity claim in state court. Billiot then sought post-

conviction relief from the Mississippi Supreme Court on that claim.

That court granted Billiot's request for an evidentiary hearing on his competency allegations,

citing both *Ford* and Miss. Code Ann. § 99-19-57(2) (1972 & Supp. 2008). *Billiot v. State*, 515 So.

2d 1234, 1235-36 (Miss. 1987). The statute, as it existed at that time, stated, in pertinent part:

> 2(a) If it is believed that a convict under sentence of death has become insane
> since the judgment of the court, the following shall be the exclusive procedural and
> substantive procedure. The convict, or a person acting as his next friend, or the
> commissioner of corrections may file an appropriate application seeking post-
> conviction relief with the Mississippi Supreme Court. If it is found that the convict
> is insane, as defined in this subsection, the court shall suspend the execution of the
> sentence. The convict shall then be committed to the forensic unit of the Mississippi
> State Hospital at Whitfield. The order of commitment shall require that the convict
> be examined and a written report be furnished to the court at that time and every
> month thereafter, stating whether there is a substantial probability that the convict
> will become sane under this subsection within the foreseeable future and whether
> progress is being made toward that goal. If at any time during such commitment the
> appropriate official at the state hospital considers the convict is sane under this
> subsection, such official shall promptly notify the court to that effect in writing and
> place the offender in the custody of the commissioner of corrections. The court shall
> thereupon conduct a hearing on the sanity of the convict. The finding of the circuit
> court is a final order appealable under the terms and conditions of the Mississippi
> Uniform Post-Conviction Collateral Relief Act.

> (b) For the purposes of this subsection, a person shall be deemed to be insane
> if the court finds that the convict does not have sufficient intelligence to understand
> the nature of the proceedings against him, what he was tried for, the purpose of his
> punishment, the impending fate which awaits him, and a sufficient understanding to
> know any fact which might exist which would make his punishment unjust or
> unlawful and the intelligence requisite to convey that information to his attorneys or
> the court.

*Id.* at 1236. (With minor stylistic changes, this statute continues to apply to inmates under a sentence

of death whose competence is in question.) The Circuit Court of Harrison County conducted an

evidentiary hearing on November 14, 1988, and found that Billiot was competent, under existing law, to be executed.

Six experts testified during that hearing – Dr. Robert McKinley, Dr. Michael Whelan and Dr. William Johnson for Billiot; and Dr. Henry Maggio, Dr. Donald C. Guild and Dr. Charlton Stanley for the State. In determining the framework for its analysis of that testimony, the trial court reviewed both the Mississippi statute and *Ford*, stating, "[T]he two tests or standards can be read together without doing violence to either and the Court applies this combined standard to the present case." Considering the experts' testimony, the court recognized that the majority of them believed Billiot to be suffering from paranoid schizophrenia, but it held that the diagnosis, alone, would not prevent Billiot from being competent to be executed. The court's ultimate conclusion on Billiot's competence follows:

> The only expert to state that Billiot was not presently competent to be executed was Dr. William Johnson. Dr. McKinley offered no opinion. The other experts stated that Billiot was competent at the time they examined him. The fact that these examinations have taken place at differing times over several years and in each instance he has been competent forces the Court to the conclusion that Billiot is presently sane and competent to be executed under the Mississippi statute because the Court finds as fact that Billiot does possess sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and has a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful and the intelligence requisite to convey such information to his attorneys or this court. The Court further finds that Billiot is also sane under the criteria set forth in <u>Ford v. Wainwright</u>, <u>supra</u>, in that he is aware of the punishment he is about to suffer and why he is going to suffer the punishment of death.

*Billiot v. State*, No. 18-761; DP-38, Findings of Fact and Conclusions of Law 39-40 (Cir. Ct. of Harrison County, Miss. May 10, 1989).

This decision was appealed to the Mississippi Supreme Court, which approved the legal standard used by the trial court and held that the evidence presented there was sufficient to support that court's conclusion. *Billiot v. State*, 655 So. 2d 1, 12-15 (Miss. 1995). The court rejected arguments attacking both the procedure by which the trial court reached its decision and its interpretation of the Mississippi statute. *Id*. at 16. The Mississippi Supreme Court also noted that Billiot had attacked the lower court's proceedings by arguing that he had been improperly medicated with anti-psychotic drugs prior to his competency evaluations. *Id*. at 16-17. However, because Billiot had not objected to the medication at the hearing, but only in the proposed Findings of Fact and Conclusions of Law that were later submitted, the court held that the argument had been waived. *Id*.

After the Mississippi Supreme Court held that Billiot was competent to be executed, he returned to this court and amended his Petition for Writ of Habeas Corpus to include his claims relative to the state court's competency evaluation. Those claims have not yet been addressed by this court, although his remaining claims were considered. Most of those claims were rejected in a Memorandum Opinion and Order entered on March 19, 1997, in which this Court held that Billiot's case should be remanded to the Mississippi Supreme Court because the instruction given on the "heinous, atrocious and cruel" aggravating circumstance was constitutionally invalid. The State appealed that denial, and the Fifth Circuit reversed and remanded for a harmless error analysis. *Billiot v. Puckett*, 135 F.3d 311, 320 (5th Cir. 1998). On August 14, 2003, this court denied relief on all issues but the *Ford* claim and certified that denial for interlocutory appeal. The Fifth Circuit refused to consider that appeal in an unpublished opinion. *Billiot v. Epps*, 107 F. App'x. 385 (5th Cir. 2004). Therefore, resolution of the competency claim is properly before this Court.

## PROCEDURAL STATUS

Billiot's *Ford* claim was stayed indefinitely in this court's 2003 Memorandum Opinion and Order. In its opinion denying an interlocutory appeal, the Fifth Circuit determined that the *Ford* claim "is the only obstacle to a final judgment . . . ." 107 F. App'x. at 387. A footnote in the opinion suggested that the *Ford* claim is premature because no execution date has been set. The court also suggested that the claim should be dismissed without prejudice, so that the requirements for an appeal could be satisfied. *Id.* at n.1. However, this court has declined to dismiss that claim, reasoning that state law requires that an execution date be set as soon as any stay of execution granted by a state or federal court is lifted. *Billiot v. Epps*, No. Civ. A. 1:86cv549(L), 2005 WL 3877731 at *2 (S.D. Miss. 2005). Thus, a finding by this Court that Billiot is competent would require that this Court's stay be lifted, and his execution would then be imminent. So that Billiot's remaining claim can be resolved and this case move forward toward a resolution, this court required the parties to prepare for a hearing on Billiot's mental status. *Id.*

At issue throughout the course of determining Billiot's competence is the effect of medication on his evaluations, which requires a balancing of the State's right to medicate him and his right to refuse such medication. In 1993, Billiot appeared before the Sunflower County Circuit Court for a hearing to determine the legality of the Mississippi Department of Corrections' forcing medication upon him, which resulted in the entry of a Consent Decree in early 1995. According to the Decree, the parties "agreed that Mr. Billiot suffers from a chronic schizophrenic disorder and it is medically appropriate and necessary to medicate Mr. Billiot with psychotropic medication." A procedure was agreed upon by which Billiot could be medicated. Later that year, apparently in accordance with this procedure, MDOC held a forced medication administrative hearing. During

that hearing, prison medical officials testified that Billiot's condition was deteriorating and recommended that he be given anti-psychotic medication, even against his will.

Medication issues continued to arise in the context of conducting *Ford* evaluations, which further delayed the resolution of Billiot's *Ford* claims. His attorneys argued that the evaluations should occur while Billiot was not medicated; however, the State argued that, given his condition while not medicated, failing to medicate Billiot might actually violate the Eighth Amendment's prohibition against cruel and unusual conditions of confinement. In an effort to proceed toward a resolution of this matter without requiring that Billiot's medication be taken away, this Court ordered that Billiot be evaluated while under his current medication regime, with all medical records provided to his counsel and the State ordered to report any change in his medication. In so doing, this Court reserved ruling on certain issues, as follows:

> In making this ruling, the Court specifically declines to rule at this time whether it can, or should, order that Billiot's medication be stopped for the purpose of a competency evaluation. The Court likewise declines to decide whether Billiot is being medicated as part of a treatment program, or primarily for the purpose of impacting the determination of competency. The Court also withholds a ruling on whether Billiot is taking medication voluntarily. Should the Court determine that Billiot is incompetent to be executed even while medicated, then these more complex issues may be avoided.

To assist this court in making this determination, Billiot has been evaluated by four experts who interviewed him in late 2007 and early 2008. In June of this year, those experts and Mr. Billiot appeared before this court to give testimony and evidence on the sole issue of whether Billiot, while taking anti-psychotic medication, is currently incompetent to be executed under federal law.

## STANDARD OF REVIEW

Respondents argue that this court should defer to the state court's 1989 finding that Billiot is competent to be executed and that, therefore, a further evidentiary hearing is improper. The Court rejects that contention, for several reasons. First, Billiot's original petition was filed in 1986, prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-32, 110 Stat. 12144 (effective as of April 24, 1996). His Amended Petition was filed in August, 1996; however, this Court specifically held, in its Order permitting the amendment, that it was to be considered as part of the original petition. This is, therefore, a pre-AEDPA case, in which the more stringent standards of review in the amended version of 28 U.S.C. § 2254 do not apply. *Lindh v. Murphy*, 521 U.S. 320, 326-36 (1997).

While a presumption of correctness applies to the state court's findings of fact, under pre-AEDPA law, this Court may review questions of law or mixed questions of fact and law de novo, granting no deference to state court adjudications. *Thompson v. Keohane*, 516 U.S. 99, 111-12 (1995). A competency determination made by a state court is a factual issue. *See Demosthenes v. Baal*, 495 U.S. 731 (1990). However, the standard by which competency is evaluated is a legal issue. *See, e.g., Indiana v. Edwards*, 128 S. Ct. 2379, 2387-88 (2008) (establishing standard for judging competence to conduct own defense); *Dusky v. United States*, 362 U.S. 402 (1993) (per curiam); *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (establishing standard for judging competence to stand trial).

A compelling reason exists in this case to discount the state court's opinion. Specifically, given that the issue here is Billiot's **present** competence to be executed, this court is of the opinion that a presumption of correctness should not apply to a finding of competence made on the basis of

medical testimony given twenty years ago. Respondents admitted as much at the beginning of the recent hearing, where, although arguing that a full and fair hearing occurred in state court, their counsel went on to state, "[W]e would say that we think that the inquiry here is a discrete inquiry of whether or not Mr. Billiot is presently competent to be executed, and not whether he was competent ten years ago, twenty years ago, or five years ago." (Transcript of June 25-26 hearing, p. 4)

Additionally, the court notes that one factor in the earlier finding of competency was the possibility that Billiot might be malingering, or exaggerating his symptoms. Dr. Guild, who testified at that hearing, specifically raised that possibility. Since then, numerous mental health professionals have examined Billiot, and none of them has offered that rationale for his behavior. Even the two experts who testified for Respondents during the hearing in this court believe that Billiot is not malingering. Moreover, the history of Billiot's mental disorder, which is documented for over thirty years, shows sustained, consistent behaviors that support a finding that Billiot's symptoms are not just real, but that they are becoming exacerbated with time. The experts who evaluated him for his earlier competency hearing obviously lacked this wealth of information. After consideration of all of these factors, this court has determined that the state court's 1989 findings will be considered only in a historical context, as part of the continuing course of Billiot's mental illness, which all of the experts have agreed is chronic. *See, e.g.*, *Thompson v. Bell*, Nos. 06-5744, 06-5770, 2009 WL 2901193 at *8 (6th Cir. Sept. 11, 2009) (holding that, while the petitioner's documented history of mental illness was not dispositive of the question of incompetence, "it is at least probative of the seriousness of his illness and whether it is chronic") This court's inquiry, then, will be limited to a determination of whether Billiot is presently incompetent to be executed, based on the current law and the evidence and testimony presented to the court in the hearing held on June 25-26, 2009.

## STANDARD FOR DETERMINING COMPETENCY

The prohibition against execution of the mentally ill is based on ancient traditions of English common law. When *Ford v. Wainwright*, 477 U.S. 399 (1986), was decided, no state permitted the execution of the insane. *Id*. at 408 n.2. Prior to *Ford*, however, the United States Constitution only provided procedural due process protection for the exemption from execution that was provided by state law. *See, e.g., Phyle v. Duffy*, 334 U.S. 431 (1948). *Ford* recognized that the Eighth Amendment also provides a restriction on a state's substantive power to execute the mentally incompetent.

Alvin Ford was convicted of murder and sentenced to death in the State of Florida. Well after his trial and sentencing, Ford began to exhibit bizarre behavior, based on his apparent belief in a wide-ranging conspiracy against him, which included the delusion that his family and friends had been taken hostage. His attorney ultimately invoked the procedures of Fla. Stat. § 922.07 (1985) to have Ford declared incompetent to be executed. In accordance with that statute, which prohibited execution of a prisoner unless he had "the mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him," the Governor of Florida appointed three psychiatrists to examine Ford. Each of the psychiatrists concluded that Ford had a severe mental disorder, but all of them concluded that he was competent to be executed under Florida law. Based on those opinions, the Governor signed a death warrant for Ford's execution, without further explanation. *Ford*, 477 U.S. at 402-04.

Two issues were before the Court in *Ford*: whether the Eighth Amendment prohibited the execution of the insane and whether the procedure employed by the Florida court to determine competency was constitutionally adequate. The Court's ultimate determination in Ford's favor on

both issues was a plurality decision. Seven justices agreed that the Florida procedure was constitutionally inadequate; however, only four believed that a full evidentiary hearing was required. Justice Powell wrote separately to disapprove of Florida's procedure, but he would have held that any procedure that provided an impartial officer and an opportunity for the prisoner to be heard was adequate. On the substantive issue, five justices agreed with the general principle that the execution of the insane, as proscribed in the common law and statutorily prohibited in all states, violated the Eighth Amendment; however, Justice Powell wrote separately on the issue of the definition of insanity.

In his discussion of the historical context of the prohibition against executing the insane, Justice Marshall, writing for himself and three others, recognized several historical bases for the rule. He first cited Blackstone for the principle that a man who becomes insane after judgment, but before execution, should have his execution stayed, "[F]or peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." *Id.* at 406 (quoting 4 W. Blackstone, "Commentaries," 24-25). Other reasons were also offered in support of the common-law prohibition. The first was, "[T]he execution of an insane person simply offends humanity." 477 U.S. at 407. Second, Marshall noted, "[I]t provides no example to others and thus contributes nothing to whatever deterrence value is intended to be served by capital punishment." *Id.* The third reason advanced was, "[I]t is uncharitable to dispatch an offender 'into another world, when he is not of a capacity to fit himself for it.'" *Id.* (quoting Hawles, "Remarks on the Trial of Mr. Charles Bateman," 11 How. St. Tr. 474, 477 (1685)). He identified as a fourth rationale, that "execution serves no purpose in these cases because madness is its own punishment . . . ." 477 U.S. at 407. Finally, Marshall recognized, "[T]he community's quest for

'retribution'– the need to offset a criminal act by a punishment of equivalent 'moral quality'– is not served by execution of an insane person, which has a 'lesser value' than that of the crime for which he is to be punished." *Id*. at 408. Justice Marshall found all of these reasons to have continued "logical, moral, and practical force . . . ." *Id*. at 409. While not expressly adopting any of these rationales over another, Justice Marshall stated, "It is no less abhorrent today than it has been for centuries to exact in penance the life of one whose mental illness prevents him from comprehending the reasons for the penalty or its implications." *Id*. at 417. He concluded, "Whether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction finds enforcement in the Eighth Amendment." *Id*. at 410.

As Justice Powell noted in his concurrence, the determination of a prisoner's sanity is not an issue that can be resolved by reference to historical facts. 477 U.S. at 426. Instead, it is a "basically subjective judgment . . . [that] depends substantially on expert analysis in a discipline fraught with 'subtleties and nuances.'" *Id*. (quoting *Addington v. Texas*, 441 U.S. 418, 430 (1979)). There is no "bright line" – no calculation or discrete measurement – for determining who is ineligible for execution. For this reason, the analysis is markedly different from that conducted in *Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting execution of individuals who were under eighteen when they committed the crime), or *Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting execution of mentally retarded individuals). Believing that Justice Marshall's opinion had not set forth the meaning of insanity in this context, and that the historical arguments "do not provide a common answer when it comes to defining the mental awareness required by the Eighth Amendment as a

prerequisite to a defendant's execution,"Justice Powell wrote separately to address that issue. *Id*. at 418-19.

Justice Powell specifically discounted one historical theory for the prohibition against execution of the insane – that an insane prisoner could not adequately assist counsel in making arguments against his execution. In Justice Powell's view, that justification has no force in modern practice, which provides far more extensive review of convictions and sentences–particularly death sentences--than did the common law, including not only direct appeal but ordinarily both state and federal collateral review, throughout all of which the defendant has access to counsel, and indeed, the right to **effective assistance** of counsel at trial and on appeal. *Id.* at 420. Justice Powell thus considered it "unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free." *Id.*

Justice Powell agreed, however, that other rationales identified by Justice Marshall remained valid:

> The more general concern of the common law-that executions of the insane are simply cruel-retains its vitality. It is as true today as when Coke lived that most men and women value the opportunity to prepare, mentally and spiritually, for their death. Moreover, today as at common law, one of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalty's existence and purpose. Thus, it remains true that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes of executions generally. For precisely these reasons, Florida requires the Governor to stay executions of those who "d[o] not have the mental capacity to understand the nature of the death penalty and why it was imposed" on them. Fla.Stat. § 922.07 (1985 and Supp.1986).

*Id*. at 422. Justice Powell observed that, in fact, while some states (including Mississippi) had more rigorous standards, prohibiting the execution of a defendant who is unable to assist in his own defense, "none disputes the need to require that those who are executed know the fact of their

impending execution and the reason for it." *Id.* And in his view, this was all the Eight Amendment required:

> Such a standard appropriately defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition. If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

*Id.*

Subsequent opinions from lower courts assumed that Justice Powell's definition of competence was controlling without much reference to the other language in *Ford. See, e.g., Scott v. Mitchell*, 250 F.3d 1011, 1014 (6th Cir. 2001); *Massie v. Woodford*, 244 F.3d 1192, 1195 n.1 (9th Cir. 2001); *Coe v. Bell*, 209 F.3d 815, 825-26 (6th Cir. 2000); *Fearance v. Scott*, 45 F.3d 633, 640 (5th Cir. 1995); *Rector v. Clark*, 923 F.2d 570, 572 (8th Cir.), *cert. denied*, *Rector v. Bryant*, 501 U.S. 1239 (1991). In one case, *Walton v. Johnson*, 440 F.3d 160, 170 (4th Cir. 2006), the court analyzed the effect of the plurality opinion by reference to the principle announced in *Marks v. United States*, 430 U.S. 188 (1977). In *Marks*, the Court held, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" 430 U.S. at 194 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

The *Walton* court noted that the issue was not quite clear, since Justice Powell had specifically stated that the "Court's opinion does not address . . . the meaning of insanity." 440 F.3d at 170 n.10 (quoting *Ford*, 477 U.S. at 418). Additionally, the *Walton* opinion recognized that

Justice Marshall, in a dissent from the denial of certiorari in another case, *Rector v. Bryant*, 501 U.S. 1239, 1241-42 (1991) (Marshall, J., dissenting), argued forcefully that *Ford* left unsettled the parameters of mental disturbance that would prohibit execution. On the other hand, considering "the actual discussion of rationales and the overlapping agreement on one of the rationales in both the *Ford* plurality opinion and Justice Powell's concurrence" and in light of the Supreme Court's "acknowledgment of Justice Powell's proffered test (albeit in dicta) as the appropriate standard" in Penry v. Lynaugh, 492 U.S. 302, (1989) (holding that the Eighth Amendment did not prohibit the execution of a mentally retarded inmate), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), the *Walton* court concluded that the *Ford* Court effectively adopted Justice Powell's proffered two-part test as the constitutionally minimum standard for determining mental competence to be executed. 440 F.3d at 170.

This was the state of the law when Scott Panetti's case was decided. Panetti, who suffered from a fragmented personality, delusions and hallucinations, killed his estranged wife's parents in front of his wife and their daughter. His habeas attorneys produced evidence that, while Panetti claimed to understand that the state wanted to execute him for the murders he committed, his mental illness had resulted in a delusion that the stated reason for his execution was a sham, and that the state actually intended to kill him to stop his preaching. *Panetti v. Dretke*, 401 F. Supp. 2d 702, 708 n.3 (W.D. Tex. 2004). This claim had been presented in state court, resulting in the appointment of two experts to examine him. *Id*. at 704. Those experts concluded that Panetti was competent, and the state court ruled against Panetti without giving him an opportunity to rebut those opinions. *Id*. The district court that considered his claim held, first, that the state court opinion was not entitled

to deference under AEDPA, as the proceedings in state court were constitutionally inadequate. 401 F. Supp. 2d at 705-06.

The court then struggled with the question of whether Panetti was incompetent under the rationale of *Ford*. According to the district court, Justice Powell's opinion defined competence as perceiving the connection between the crime and the punishment, thereby satisfying the retributive goal of the death penalty. *Id*. at 709. In order to satisfy that goal, however, the prisoner's perception must include not just factual knowledge of the reason for execution, but also his understanding, or, as Justice Powell stated, "[T]he Eighth Amendment forbids the execution only of those who are *unaware* of the punishment they are about to suffer and why they are to suffer it." *Id*. at 709-10, quoting *Ford*, 477 U.S. at 422 (emphasis added). The district court reviewed Fifth Circuit precedent on this issue, however, and concluded that the appellate court had not adopted Justice Powell's reasoning in its entirety, but only adopted his standard in a limited sense. "[T]he Fifth Circuit has, without any discussion of the potential broader import of the statement, apparently interpreted Justice Powell's use of the concept of 'awareness why' to require no more than knowledge of the required factual predicate for an execution." *Id*. at 710 (citing *Fearance v. Scott*, 56 F.3d 633, 640 (5th Cir. 1995); *Barnard v. Collins*, 13 F.3d 871, 876 n.2 (5th Cir. 1994); *Garrett v. Collins*, 941 F.2d 57, 59 (5th Cir. 1992); *Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir. 1988)).

Panetti had argued that he would be held incompetent using Justice Powell's reasoning, but the district court's dissection of the *Ford* opinions compelled a conclusion that Justice Powell's concurrence was *not* controlling, in that the opinion of the other four justices in the majority "specifically declined to reach a holding on the question of what standard should be used to determine incompetency for the purposes of the Eighth Amendment." 401 F. Supp. 2d at 710. For

this reason, the district court held, "[T]he Powell concurrence does not operate as binding Supreme Court precedent on what standard governs competency to be executed." *Id*. Examining Fifth Circuit precedent, the district court concluded that the "retributive goal" requirement of Justice Powell's concurrence had not been adopted. "Ultimately, the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution." *Id*. at 711. Panetti was aware that he was convicted for the murders of his in-laws and that he was to be executed. Although there was evidence demonstrating that Panetti did not appreciate the connection between the murders and his execution, under controlling Fifth Circuit precedent, his lack of understanding did not exempt him from the death penalty. *Id*. at 709-12.

On appeal, the Fifth Circuit declined to rule on the issue of whether the state's procedure for reviewing Panetti's claim was adequate and entitled to deference. *Panetti v. Dretke*, 448 F.3d 815, 817 (5th Cir. 2006). However, on the issue of competence, the court reviewed its earlier decisions and concluded that the standard for competence to be executed in the Fifth Circuit required only that an inmate to be aware of his punishment and why he is to suffer it. *Id*. at 819-21. Holding that "awareness" was not synonymous with "rational understanding," the court found Panetti competent to be executed. *Id*.

The Supreme Court reversed. *Panetti v. Quarterman*, 551 U.S. 930 (2007). Addressing a jurisdictional issue, the Court held that Panetti's petition was not "second or successive," within the meaning of 28 U.S.C. § 2244, as it held that the statute did not apply to bar *Ford* claims "filed when the application is first ripe." *Id*. at 947. Turning to the issue of whether Florida's procedure to determine competence was entitled to deference, the Court discussed the split of opinions in *Ford*

as to what was constitutionally required in a state competency proceeding. Applying *Marks*, 430 U.S. at 193, the Court held that Justice Powell's opinion on that issue, which "offered a more limited holding," constituted clearly established law and set the minimum standard for such a proceeding. 441 U.S. at 949. Even under Justice Powell's standard, however, the Texas procedure was constitutionally inadequate. *Id*. at 950-52. The process having been inadequate under *Ford*, and Justice Powell's opinion constituting clearly established law, the state court's opinion was not entitled to deference under AEDPA. *Id*. at 953-54

Then the Court considered whether Panetti's delusions made him incompetent to be executed under *Ford*. Although it recognized that the application of the Eighth Amendment to the issue of executing the insane resulted from a plurality opinion, the Court neither referenced *Marks* nor deferred to Justice Powell's concurrence. *Id*. at 957-59. Instead, the Court acknowledged that *Ford* did not provide a precise standard for competency. "The four-Justice plurality discussed the substantive standard at a high level of generality; and Justice Powell wrote only for himself when he articulated more specific criteria." *Id*. at 957. Characterizing Justice Marshall's opinion as "the opinion of the Court," the *Panetti* Court recited these reasons from *Ford* as the foundation for the constitutional prohibition against executing mentally incompetent prisoners :

> [T]oday, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life . . . . Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.

*Panetti*, 551 U.S. at 957 (quoting *Ford*, 477 U.S. at 409-10).

According to the Court, the prohibition rested upon reasons recognized at common law and recited in "the controlling portion" of Justice Marshall's opinion in *Ford*. 551 U.S. at 958. One of those reasons was the failure of such an execution to serve any retributive purpose. *Id*. In most cases, imposition of the death penalty "has the potential to make the offender recognize at last the gravity of his crime and to allow the community as a whole . . . to affirm its own judgment that the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed." *Id*. This effect is questionable, however, "if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." *Id*. at 958-59.

Retribution was not the only rationale to be considered, however, as the Court went on to state, "[T]he other rationales set forth by *Ford* fail to align with the distinctions drawn by the Court of Appeals." *Id*. at 959. Later in the opinion, the Court repeated that the "principles set forth in *Ford* are put at risk" by the Fifth Circuit's interpretation of the competence standard. *Id*. Likewise, the Court held, the Fifth Circuit's interpretation "find[s] no support elsewhere in *Ford*, **including in its discussions of the common law and the state standards** . . . ." *Id*. (emphasis added). Thus, it held, it was "error to derive from *Ford*, and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted." *Id*.

This language indicates that the Court in *Panetti* intended to do more than to simply include a delusional state as a factor that could fit an accused within the narrow test enunciated by Justice Powell. Although *Panetti* held that a delusional state could prevent an inmate from having a rational

understanding of his fate, the Court refused to adopt Justice Powell's definition or to enunciate "a rule governing all competency determinations." *Id.* at 960-61. Instead, the opinion appears to open the analysis of competence to consideration of the other common law factors recognized by Justice Marshall as relevant to this issue.

A determination of mental illness is necessarily subjective, and the legal definition of competence is not precise. It is not surprising, therefore, that lower courts were left by the *Panetti* opinion without a specific measure of incompetence to be executed. They were not, however, left completely without guidance from the Supreme Court on how a competency analysis should be undertaken:

> The underpinnings of petitioner's claims should be explained and evaluated in further detail on remand. The conclusions of physicians, psychiatrists, and other experts in the field will bear upon the proper analysis. Expert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent. Cf. Brief for American Psychological Association, et al., as *Amici Curieae* 17-19 (discussing the ways in which mental health experts can inform competency determinations). And there is precedent to guide a court conducting Eighth Amendment analysis. *See, e.g., Roper v. Simmons*, 543 U.S. 551, 560-564, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-314, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); *Ford*, 477 U.S., at 406-410, 106 S. Ct. 2595.

*Id.* at 962.

Although the Court in *Panetti* declined to set forth a specific definition of incompetence applicable in all cases, as the district court observed on remand in *Panetti*, the Supreme Court made clear in its opinion in *Panetti* that, "in the Eighth Amendment context, 'insanity' does have a baseline definition: the test for competence to be executed involves not only a prisoner's factual awareness of the crime, the impending execution, and the state's reason for executing the prisoner, but also some degree of 'rational understanding' of the connection between the crime and the

punishment." *Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498, 31 (W.D. Tex. March 26, 2008) (quoting *Panetti*, 127 S. Ct. at 2861). However, the Court's citations to *Roper, Atkins* and *Ford* suggest that Eighth Amendment analysis of a defendant's competence to be executed must include consideration of society's current perception of capital punishment and the effect of that perception on the determination of what constitutes cruel and unusual punishment in the context of competence to be executed. As the Court recognized in *Atkins*, "A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but rather by those that currently prevail." 536 U.S. at 311. More recently, the Court reasoned that the Eighth Amendment's scope must continue to evolve, "because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

In *Ford*, the Court summarized the "ancestral legacy" against execution of the insane and concluded that it had "not outlived its time. Today, no State in the Union permits the execution of the insane." 477 U.S. at 408. In *Atkins*, the Court reviewed recent legislation by the states to determine whether "evolving standards of decency" indicated a trend toward exempting mentally retarded offenders from execution. 536 U.S. at 312-13. Similarly, in *Roper*, the Court looked at the evolution of the law prohibiting the execution of juveniles since the time that it earlier held such executions constitutional. 543 U.S. at 562-65. In each of these cases, the Court decided that there was "objective indicia of consensus" sufficient to hold that the Eighth Amendment should be

extended to exempt certain classes of offenders from punishment by death. On the whole, then, it can surely be said that there is a trend toward narrowing the class of inmates against whom the death penalty may be imposed consistent with the Eighth Amendment's prohibition against cruel and unusual punishment. As to whether this existence of this trend supports a conclusion that "evolving standards of decency" suggest a broader definition of incompetence than the baseline definition recognized in *Panetti* is another matter.

At the time *Ford* was decided, forty-one states had the death penalty or statutes governing execution procedure. *Ford*, 477 U.S. at 408 n.2. Since *Ford*, the number of death penalty states has dropped from forty-one to thirty-six states, of which two (New York and Illinois) have death penalty statutes, but are not permitting execution at this time.[1] Of the remaining thirty-four states, sixteen have a definition of competence similar to Justice Powell's formulation that is either contained in legislation[2] or has been adopted by common law.[3] Five states have no statutory or common law

---

[1]New York's death penalty statute has been declared unconstitutional, and it has not been re-written by its legislature. *See People v. Taylor*, 9 N.Y.3d 129, 878 N.E.2d 969 (2007); *People v. LaValle*, 3 N.Y.3d 88, 817 N.E.2d 341 (2004). In Illinois, the moratorium on executions declared by then-Governor George Ryan in 2000 is apparently still in effect. Sanchez, Robert, *State Moratorium on Executions – 10 Years and Counting*, Chicago Daily Herald, July 28, 2009, *available at* http://www.dailyherald.com/story/print/?id=310033.

[2]Ariz. Rev. Stat. Ann. § 13-4021(b) (Westlaw 2009); Ark. Code Ann. § 16-90-506(d)(1) (Westlaw 2009); Col. Rev. Stat. Ann. § 18-1.3-1401(2) (Westlaw 2009); Fl. Stat. Ann. § 922.07(1) (Westlaw 2009); Ga. Code Ann. § 17-10-60 (Westlaw 2009); Ky. Rev. Stat. Ann. § 431.213(2) (Westlaw 2009); La. Rev. Stat. Ann. 15:567.1.B (Westlaw 2008); Md. Code Ann. § 3-904(a)(2) (Westlaw 2009); Ohio Rev. Code Ann. § 2949-28(A) (Westlaw 2009); S.D. Codified Laws §23A-27A-22.1 (Westlaw 2009); Tex. Code Crim. Proc. Ann. art 46.05(h) (Westlaw 2009) (held unconstitutional insofar as it denied counsel and was construed without reference to rational understanding in *Wood v. Quarterman*, 572 F. Supp. 2d 814 (W.D. Tex. 2008)); Utah Code Ann. § 77-19-201 (Westlaw 2009); Wy. Stat. Ann. § 7-13-901(a)(v) (Westlaw 2009).

[3]*Sanders v. State*, 585 A.2d 117, 138 (Del. 1990); *Baird v. State*, 833 N.E. 2d 28, 30 (Ind. 2005); *Van Tran v. State*, 6 S.W.3d 257, 266 (Tenn. 1999).

definition of incompetence to be executed.[4] Two states require the accused to understand the reasons for his death sentence "and its implication."[5] Eleven other states mandate, by statute[6] or by common law,[7] that an inmate is competent to be executed only when he can communicate with counsel or assist in his defense.

In the court's opinion, these numbers do not reflect a broader definition of incompetence than that identified in *Panetti*. Obviously, the national debate over the death penalty now includes a discussion of *whether* it should be imposed, in addition to *when* it is justified (owing perhaps to financial considerations and advances in forensic science) ; and, society's perspective on execution appears to be moving more toward exclusivity, being reserved for those situations in which its punitive goals are best served. However, in the court's opinion, this trend does not suggest that society's perspective on the appropriate standard for gauging incompetence has changed, or "evolved", since *Panetti* was decided. Rather, the question remains whether the defendant has a rational understanding of his conviction, his impending execution, and the relationship between the two.

---

[4]California, Idaho, Kansas, New Hampshire and Virginia.

[5]Or. Rev. Stat. § 137.463(4) (Westlaw 2009); *Commonwealth v. Jermyn*, 539 Pa. 371, 776, 652 A. 2d 821, 824 (1995).

[6]Conn. Gen. Stat. § 54-56d (1991) (Westlaw 2009); Miss. Code Ann. §99-19-57(2)(b) (1972 & Supp. 2009); Mo. Rev. Stat. § 552.060(1) (Westlaw 2009); Mont. Code Ann. §§ 46-19-201 & 46-14-103 (Westlaw 2007); Neb. Rev. St. § 29-2537 (Westlaw 2009); N.C. Gen. Stat. §15A-1001(a) (Westlaw 2009).

[7]*Magwood v. State*, 689 So. 2d 959, 973 (Ala. Crim. App. 1996); *Fisher v. State*, 845 P.2d 1272, 1276 n.3 (Okla. 1992); *Singleton v. State*, 313 S.C. 75, 84, 437 S.E.2d 53, 58 (1993); *State v. Harris*, 114 Wash. 2d 419, 430, 789 P.2d 60, 66 (1990).

## BILLIOT'S MEDICAL HISTORY

Although the parties agreed at the hearing that Billiot's previous diagnoses were not dispositive of the issue of whether his current mental state exempted him from execution, they also concurred that the earlier medical records provided a context in which to examine his claim of current incompetence. Specifically, the Court is of the opinion that the records are important to evaluate whether Billiot's current manifestation of mental disorder is genuine, as well as providing insight into his long-term prognosis.

Billiot was born on June 10, 1961, and testimony at his 1983 murder trial revealed that his difficulties began early in life. His parents apparently divorced when he was very young, and, when he was about five years old, his mother began dating Wallace Croll. When Billiot was about seven, his mother and Croll married. Croll had three sons of his own, and he and Billiot's mother, Audrey, had a son and a daughter. According to his aunt, Helen Stevenson, Billiot's childhood was very unhappy, and his mother and stepfather both mistreated him. He often went from his mother's house to his aunt's or his grandparents' to stay. By the time that he was a teenager, Billiot was living on the streets.

Billiot displayed symptoms of mental disturbance in early adolescence, and, a few years before the murders, he told family members that he was Jesus Christ. The Honorable Walter Gex, currently a District Judge in this District, represented Billiot in an early commitment proceeding, and he later testified that he remembered some religious involvement on Billiot's part – evidenced by Billiot's thinking that he was either Jesus Christ or the devil. Henry Cook, who was the master at that proceeding, recalled Audrey Croll's testifying that Billiot would appear in her room at night with

a knife, saying that he was there to release the devil from his side. She also reported that he had written letters saying he was Jesus.

In 1975, Billiot was admitted to the East Louisiana State Hospital. In December, 1978, he was admitted to the East Mississippi State Hospital for treatment of substance abuse. No signs of psychosis or retardation were noted, although Billiot self-reported mental disturbances dating from the time he was fourteen or fifteen. In January, 1979, he was re-admitted to that hospital, where he was diagnosed with antisocial personality disorder and mixed substance dependence. In July of that year, Billiot was sent to the Mississippi State Hospital, after his mother reported that he had been having hallucinations and believed himself to be Jesus Christ. One doctor found no evidence of psychosis, and Billiot was discharged. However, a psychiatrist and a psychologist who examined him at that time believed that Billiot suffered from paranoid schizophrenia, with religious delusions and threats of combative behavior. They also believed that Billiot was a danger to himself or others and was in need of hospitalization.

By August 13, 1979, Billiot was again admitted to the East Mississippi State Hospital for drug treatment. Hospital records indicated that he had been admitted to Charity Hospital in New Orleans three months earlier, after stating that he had access to a gun and wanted to kill someone in self-defense. On August 15, he was again diagnosed as having antisocial personality disorder and multiple drug dependence; later that day, Billiot tried to hang himself. While the discharge report noted no signs of psychosis, the prognosis was extremely poor. Other than a follow-up visit to the Gulf Coast Mental Health Center in September, 1979, there are no other mental health records for Billiot before the murders on November 26, 1981.

After he was arrested, Billiot was returned to the Mississippi State Hospital for evaluation of an insanity defense and his competence to stand trial. In January, 1982, Dr. Henry Maggio and Dr. Leonard Ball interviewed him. At that time, Billiot admitted to being at his parents' home at the time of the murders, but said that he saw the devil actually kill them, after which he took money from his mother and stepfather and drove away in their car. Dr. Maggio diagnosed Billiot as paranoid schizophrenic, without psychosis, although he was delusional. However, he found Billiot to be aware and goal directed and competent to stand trial. Dr. Ball was one of the physicians who had recommended, in 1979, that Billiot not be released, and his diagnosis of paranoid schizophrenia did not change after the 1982 evaluation.

Dr. A. G. Anderson, the Director of Forensic Psychiatry at the State Hospital, diagnosed Billiot with a schizophreniform disorder. It was his opinion that Billiot was not a paranoid psychotic person at the time of his examination, although Dr. Anderson believed that "he may have undergone a schizophreniform disorder type illness at or about the time of the crime . . . ." However, Dr. Anderson concluded that Billiot was responsible for his crime and competent to stand trial. He related that a vote had been taken among the mental health professionals who had dealt with Billiot at the State Hospital, and the majority agreed with him, although the vote was not unanimous.

Billiot was also given a psychological evaluation, performed by Dr. William Johnson. In addition to other tests, Johnson administered the MMPI. Dr. Johnson interpreted Billiot's results as follows:

> On the MMPI, Mr. Billiot's profile was one of "faking good" based on elevations in the L and K scales. The interpretation of this response pattern is that he attempted to portray himself as being well adjusted. However, on the clinical scales Mr. Billiot scored highest on the Paranoid and Schizophrenia scales. This

pattern of scores is most consistent with the diagnosis of paranoid schizophrenic by
one who is trying to make himself appear well adjusted.

Johnson believed that Billiot was not criminally responsible, noting that, while Billiot could provide
a detailed account of the events that occurred on the day of the murder, he "was operating under a
delusional system" and could not conform his behavior to "conventional standards of right and
wrong." He concluded that, on the day of the crime, "Mr. Billiot acted under an irresistible impulse
as a result of his delusional system with a diminished capacity to appreciate the consequences of his
actions." However, Johnson concluded that Billiot was competent to stand trial, so long as he was
given "specific instructions regarding his courtroom behavior and how to assist his attorney . . . ."
A deputy at the Harrison County Jail, where Billiot was confined prior to his conviction, said that
he would refer to himself as different people, including Hitler and General Lafitte. Billiot also
expressed a belief in werewolves.

Billiot's mental disturbances continued after his conviction and move to the Mississippi State
Penitentiary at Parchman, where he was initially diagnosed as having an anti-social personality.
After repeated requests for psychiatric evaluation, Billiot received a neuropsychological evaluation
on March 16, 1984, by Dr. Michael Whelan. His impressions were that Billiot suffered from: (1)
higher cortical dysfunction mild and bilateral; (2) mixed substance abuse (by history); and (3)
schizophreniform disorder versus schizotypal personality disorder. Dr. Whelan saw Billiot again a
few months later and noted that, while not psychotic, Billiot "does process very strange thought
patterns." Those thoughts included the belief that he was engaged in spiritual warfare with the devil.

In January,1987, Billiot asked Dr. Whelan to give him Mellaril, an anti-psychotic. Dr.
Whelan referred the request to Dr. Robert McKinley, a psychiatrist. Dr. McKinley agreed to

prescribe the drug, stating, "Since he has requested Mellaril, an accepted drug for the treatment of schizophrenia, and he definitely has beyond the shadow of a doubt a chronic paranoid schizophrenic disorder, it seems to me both rational, ethical and responsible to prescribe Mellaril . . . ." Apparently, Billiot took Mellaril for only a short period of time before deciding that he did not like its effects. For several months thereafter, he demanded medication of his own choosing. In February, 1988, he was brought back to see Dr. McKinley, who recorded, "He obviously is schizophrenic." Billiot asked for anything but Mellaril, so Dr. McKinley prescribed Trilafon.

On July 24, 1988, Billiot was stabbed multiple times by another inmate. He was taken to the Bolivar County Hospital, where he arrived in guarded condition, due to puncture wounds in his lungs, stomach, liver, pancreas, spleen and right kidney, as well as superficial stab wounds to both shoulders. Billiot underwent surgery for his injuries and was later discharged to the Mississippi State Penitentiary Hospital for further recovery. Upon his discharge back to the Maximum Security Unit, he was given another prescription for Mellaril.

In November, 1988, the Circuit Court of Harrison County held the competency hearing for Billiot that was described earlier in this opinion. The conclusions of the experts who testified have already been summarized; however, some of the details of their testimony are relevant to understanding the course of Billiot's mental illness. Dr. McKinley, who had described Billiot as "obviously schizophrenic" in the medical records, reported that Billiot had bizarre delusions and disorganized thinking. He also testified that Billiot's condition was chronic, and "he's not likely to get well." Dr. Whelan reported that, in 1985, he reported that Billiot was "firmly entrenched in a delusional system which permits him to acknowledge the fact that he did indeed murder the Croll family, but which permits an absolution of his guilt." Despite his opinion at that hearing that Billiot

was competent to be executed, Dr. Whelan admitted that his symptoms of schizophrenia could exacerbate to the point where he became "floridly psychotic" and incompetent. Dr. Whelan also read from his report of Billiot's stabbing by an inmate named Harper, which said, "[S]ecurity staff relate that James was constantly talking to demons and spirits throughout the night and because he wouldn't be quiet, Harper decided to silence him." Dr. Guild, who testified that Billiot was competent and believed that he was malingering, admitted that the testimony of the experts had raised the possibility in his mind that Billiot might actually have paranoid schizophrenia.

As discussed in an earlier section, the Circuit Court found Billiot competent to be executed, by an Order entered in May, 1989. After that point, Billiot's condition continued to deteriorate, such that the Department of Corrections felt it necessary to forcibly medicate him. He brought a lawsuit against department officials in state court, seeking an order preventing such medication and requesting damages for past administration of psychotropic drugs. A hearing was held in that case in the Circuit Court of Sunflower County in October, 1993. At that hearing, Dr. Stanley Russell testified on behalf of the Department of Corrections. Dr. Russell had first treated Billiot in 1989, shortly after the stabbing incident, and he described him as psychotic, stating, "He was hallucinating, delusional, was having difficulty sleeping at night, was keeping himself and other inmates on the tier awake, was rattling the bars, and was complaining about demons hurting him. He was grossly out of contact with reality at the time." Billiot was non-compliant with his medication, and Dr. Russell and Dr. Whelan told him that he would be forcibly injected if he failed to take his pills orally. Billiot did not comply, and, in Dr. Russell's opinion, became a threat to himself, both because he self-inflicted wounds and because other inmates began to threaten him. During that time, Russell characterized Billiot as not being competent to make a decision about his medication. Russell

remembered Billiot's saying that he could not be hurt because he had been around since the thirteenth century. Billiot cried out and complained that demons were getting in his cell and causing him trouble. He "looked like a hunted animal when you would see him in his cell."

The lawsuit was concluded by the entry of a Consent Judgment and Order in January, 1995. The Judgment recites that the parties agree that Billiot suffered from a chronic schizophrenic disorder, making it medically appropriate to treat him with psychotropic medication. The parties also agreed that it would be cruel and inhuman to refrain from medicating him, and Billiot waived his claim for damages. To prevent arbitrary forcible medication, the parties agreed that the Department of Corrections would institute a policy that must be followed before inmates were forcibly medicated. which included review by a Special Hearing Committee. Consonant with that policy, such a hearing was held for Billiot on April 28, 1995. The hearing transcript reflects that Billiot gave inappropriate answers to certain questions and laughed throughout the examination. After the interview, Dr. Whelan stated that Billiot was "in a very deteriorating condition, his cognitive processes are quite disturbed, his judgment is extremely impaired, his affect inappropriate, he is very incoherent to what would be expected in a normal discussion. He laughed throughout the evaluation, I think he is seriously mentally ill." The other members of the Committee concurred, and Dr. McKinley added, "His thought content is delusional and he doesn't seem to grasp or comprehend what we are talking about here." It was decided that Billiot would be forcibly medicated.

Billiot was given Haldol shortly after the evaluation. By May 15, 1995, Dr. McKinley reported some improvement. However, on May 19, Dr. Whelan reported on his visit with Billiot, as follows:

> Initially, James refused to talk. He kept a sheet pulled over his head and was mute. It was apparent to this writer that his sheet was wet and his jump suit was wet also. I believe that he had soaked his sheet and his jump suit in the toilet and the smell of urine was strong, so I assume that he soaked his jump suit and the sheet to to [sic] toilet, when it was still at least, partially filled with urine and then he put the jump suit back on and covered himself up with the sheet.

By June 19, Dr. Whelan reported that Billiot was more intact cognitively, and his appearance had also improved. He continued to improve to the point where he was permitted to take his medication orally. By November 8, 1995, he was reported to be disheveled, and his room was dirty, suggesting that he had become non-compliant once more. On March 5, 1996, Dr. Russell visited Billiot and reported that Billiot talked to him, but Russell could not understand what he was saying. Apparently, Billiot was not taking his medication, and Russell stated, "whether he takes it or not is out of my control."

Medical records for the next few years indicate that Billiot's condition was unchanged. In September, 1998, a note states that he "remains delusional and paranoid." A year later, he was observed scruffy and naked in his messy cell. On June 15, 2000, he was found naked and in a fetal position, unwilling or unable to talk. The next day, Dr. Clyde Glenn, a psychiatrist with the Department of Corrections, reported that Billiot was up and spoke with him, although he was non-coherent and markedly psychotic. Dr. Glenn believed that Billiot was responding to hallucinations, although Billiot would not admit it. A month later, he was described as too disorganized to carry on a conversation, and his mental status was described as progressively deteriorating. On August 3, he flooded his cell and was found naked on a mattress in the middle, stating that he was "surfing."

At this point, there was discussion between Parchman's medical staff and Billiot's counsel on whether he should be medicated, with prison officials advocating medication and his attorneys

advising against it.  Billiot was not given medication, and, in September of 2000, Dr. Glenn described his further deterioration and noted that he was becoming "less and less aware of his surroundings . . . ."  On December 13, 2000, Billiot was admitted to the hospital at Parchman, after being observed throwing, eating, and smearing feces.  Haldol was administered, and, by the 15th, although he was still considered delusional, his behavior had stabilized.  Billiot received only two shots of Haldol, but, by February, 2001, his behavior and speech had improved somewhat, according to Dr. Glenn.  However, Billiot arrived for his next examination with his pants on backwards and inside out.  He asked for more medication, but was informed that it could not be given without a court order.

The effects of the Haldol were clearly wearing off by May of 2001, when Billiot appeared for an interview somewhat unkempt.  Dr. Glenn reported that Billiot appeared to indicate that he was having hallucinations and had experienced them since childhood.  Dr. Glenn concluded, "Mr. Billiot probably has had problems with psychotic symptoms such as hallucinations and delusional beliefs since a young lad."  He again requested medication.  Dr. Glenn saw Billiot in August and noted that his appearance was somewhat improved, although his speech was rambling and he acknowledged having seen vampires in the past.  In October, Billiot was "adamant" about receiving medication, and he was told to communicate his request to his attorneys.  A short visit by Dr. Glenn in March, 2002, was uneventful.

On August 8, 2002, Dr. Terry A. Kupers, a psychiatrist working with the ACLU's National Prison Project, toured death row at Parchman to review the conditions of mentally disturbed inmates.  Dr. Kupers reported that Billiot was "obviously acutely psychotic in spite of being prescribed psychiatric medications," and further stated that he was told by other inmates that Billiot, along with

two other inmates, fouled his cell and the tier and screamed and made noises all night. Although officers had forcibly showered him and cleaned his cell prior to Dr. Kupers's visit, his cell had a foul odor by that evening. On August 28, Dr. Glenn reported that Billiot was disheveled, his thoughts were bizarre, and his speech was, at times, completely unintelligible.

Billiot continued to be unmedicated, and he was seen by Dr. Williams on July 15, 2003. His hygiene was fair; his speech was loose and rambling. After about ten minutes, he became agitated, said he could kill the doctor, and asked, "Do you want to die?" He kicked a phone on the floor, after which officers were called to escort him from the cell. A month later, he was calmer and asked for medication. In October he was described as "calm but hardly coherent . . . ." By December, a progress note states, "Patient is delusional; hears what he wants to hear." Later that month, he was doing better. On December 23, he turned in a sick call request for a psychiatric visit and one pound of marijuana.

On March, 2004, Billiot was calm, but his speech was loud and rambling. When he was seen in April, his ear canals were stuffed with paper, which he refused to discuss. He announced that he was Catholic and voted Republican and continued with other loose associations. A week later, he was described as "not in touch with conversation." On May 18, he was found lying in a fetal position in his cell, which had been stripped and recently cleaned, but still had a putrid odor and contained numerous small pieces of paper. Adjacent inmates reported a horrible stench that required cleaning with gas masks. By May 21, he was alert, responsive and clean. On June 7, he was talking non-stop "some coherent;" by July 6, he was calm, with "flashes of lucidity."

By August, 2004, he was much improved, and was reported to be keeping his cell clean and asking for daily showers, although in September, it was noted that his speech "almost always turns

to spirits, etc.," and he was still tearing paper into small pieces. He was also beginning to become more disheveled, but, on a psychiatric visit in October, the notes reflect a "pleasant surprise," in that Billiot was taking a shower. At the end of that month, however, guards reported that he was "beginning to act up," and he was observed in a messy cell full of water, with an empty toilet. Billiot's deterioration lasted into November, where he was observed asleep in a fetal position in a messy, smelly cell. By the beginning of December, his cell floor had accumulated two to three inches of trash. A week later, he was seen in a clean cell and he appeared clean shaven, with no rambling speech.

When Billiot was seen in mid-January, 2005, his condition had worsened somewhat, paper covered the floor of his cell, and it smelled bad. On one occasion, he appeared naked at his cell door. His hygiene habits regressed – both with regard to himself and his cell. Additional information on Billiot's condition at that time has been taken from the deposition of Dr. Parveen Kumar, the chief psychiatrist for the Department of Corrections. Dr. Kumar was deposed in connection with the competency hearing before this Court, and the deposition was entered into evidence at the hearing. Dr. Kumar first visited Billiot in April, 2005, and described him as psychotic. Dr. Kumar reached the same conclusion after a February, 2006, visit. In July, 2005, Billiot began receiving Thorazine, which did not appear to make him more coherent, nor did it help with his hygiene issues. That medicine was discontinued in December, 2005, and Trilafon was substituted. He began to improve, and, by March, 2006, the dosage of Trilafon was doubled. By August, Dr. Kumar reported that Billiot was "much improved." Medical records substantiate this assessment. However, because Dr. Kumar believed that he could not reduce the dosage of Billiot's medication, he added Cogentin, which was intended to reduce the side effects. By November, Dr. Kumar continued to believe that

Billiot was improving, but he noted that Billiot "remains delusional." He increased the dosage of both the anti-psychotic and the Cogentin. Dr. Kumar reported that, even after the increase in the medication level, Billiot was still delusional; however, he did sign a consent to treatment.

Dr. Kumar admitted in his deposition that he had not reviewed Billiot's medical records from treatment that occurred prior to his incarceration, but he stated that the review was unnecessary because Billiot was so psychotic by the time he saw him that he had no doubt that Billiot was chronically mentally ill. By January, 2007, Dr. Kumar reported that Billiot was much better, and he decided to reduce the number of psychiatric visits. In June, however, Billiot refused to come to the office where he was to be examined. Dr. Kumar did examine him in July and found him to be stable and significantly improved. That improvement lasted through the next few months, as reported from interviews in September and October, and, by December, Dr. Kumar reported no evidence of psychosis.

In April, 2008, Billiot informed the medical staff that he would no longer take his medication, on the advice of counsel. At that time, he was described as alert, oriented, and much improved with regard to hygiene. His thought content seemed derailed, however, and, at time, his speech was incoherent. Despite his announced intention to quit taking his medicine, he appeared to continue taking it. In July, 2008, Dr. Kumar added Welbutrin to Billiot's medications, at his request, to treat symptoms of depression. Ultimately, Dr. Kumar deviated from the prior diagnosis of schizophrenia and diagnosed Billiot as having schizoaffective, or bipolar, disorder. Some time between September 9 and October 3, 2008, Billiot's medication was changed, as well. Trilafon was discontinued, and he began receiving Wellbutrin, Tegretol and Benadryl.

Progress notes from an interview conducted on November 17, 2008, were included in the record, but are difficult to read. They appear to indicate that his mood was stable after the change in medication. Billiot was seen again on January 12, 2009. It was noted that his eye contact and hygiene were appropriate, but he was insistent on becoming a tier worker, and he was anxious to find out if that would be permitted. Notes from interviews in February and March, 2009, are similarly difficult to decipher. In February, it appears that Billiot talked excessively about jobs he had in New Orleans prior to his arrest and the places he lived. He had difficulty stopping talking so that he could hear the interviewer's questions. The notes from the March observation state that Billiot had become quiet and withdrawn over the preceding few weeks, paying little attention to his hygiene.

Those notes mark the end of the medical records relative to Billiot's mental status. This recitation would be incomplete, however, without an account of his appearance at the June 25-26 hearing. The Court had an opportunity to observe Billiot for a day and a half, as he sat in the courtroom listening to testimony and arguments. His appearance was unkempt, and he sat in a crouched, almost fetal position. At one point during the hearing, he began moaning incoherently, until one of his guards spoke to him. Billiot kept his head down most of the time, and he seemed to be almost oblivious to the proceedings that were so critical to his future. There was no indication that he was consulted by his counsel or provided any meaningful assistance to their efforts.

# EXPERT TESTIMONY

To prepare for this hearing, Respondents selected two experts to examine Billiot – Dr. Gerald O'Brien, a clinical psychologist, and Dr. John Montgomery, a psychiatrist. Billiot's counsel also selected two experts – Dr. Raquel Gur, a psychiatrist, and Dr. William Johnson, a psychologist. Dr. O'Brien has interviewed Billiot on three occasions: July 20, 2001; May 28, 2003; and, jointly with Dr. Montgomery, on December 11, 2007. The first interview would have occurred, according to the history recited above, at a point where earlier shots of Haldol were reportedly wearing off.

Dr. Gerald O'Brien is a clinical and forensic psychologist in private practice, who also consults with state mental health facilities. He has been recognized numerous times as an expert in forensic psychology and has testified on many occasions. His assessment of Billiot's behavior during the 2001 examination follows:

> He was generally alert and cooperative. His mood was euthymic and his affect ranged from intense stare to silly laughter at various times during the interview. His thinking was clearly tangential and disorganized at times, consistent with his history of psychological/psychiatric problems. He was able to focus on specific questions if encouraged to do so, but otherwise his responses tended to wander far and wide. He denied hallucinations.

Dr. O'Brien administered a test to evaluate the possibility of malingering and concluded that Billiot was not faking his symptoms. His ultimate opinion was that Billiot perceived the connection between his crime and his punishment, was aware that the punishment was the death penalty, and understood that the execution of the death penalty was approaching.

Dr. O'Brien's next meeting with Billiot occurred in May, 2003, at a time when he continued to be unmedicated and evidenced a deterioration in his condition. Because of technical problems in the recording, O'Brien re-interviewed Billiot in July. Although the records do not indicate any

change in his medication status between the two visits, O'Brien noted that Billiot was much calmer and less angry during the second interview. In other respects, O'Brien found Billiot's behavior similar to earlier visits, in that he was talkative, easily distracted, and preferred to discuss his experiences prior to being incarcerated. O'Brien concluded once more that Billiot was competent to be executed.

As stated earlier, Dr. O'Brien and Dr. Montgomery met with Billiot again in December, 2007, at a time when Billiot was taking an anti-psychotic medication. That interview was also videotaped. In this video, Billiot appears neat and clean. He is alert and cooperative. After getting some preliminary information from Billiot, the experts asked him why he was in Parchman. Specifically, the relevant questioning follows:

Q.: So, you've been in Parchman 26 years; that's a long time? Why are you there? How did you get locked up?

A.: Well, that's just it – capital murder charges; three of them.

Q.: Capital murder charges – times three?

A.: [Unintelligible]

Q.: So, in D building, death row, is that where you are?

A.: Yeah, the mental ward . . . .

....

Q.: So you got convicted of three murders, and sentenced to what?

A.: Sentenced to death.

Q.: Has that changed at all? In twenty six years?

A.: Well, not that I know of, you know. My lawyer's working on it – John Henegan. . . .

Q.:     What's he trying to do?

A.:     He's trying to get me work out there, because I still suffer from mental problems.

....

Q.:     Is he trying to get you a job with a work detail?

A.:     Yeah, yeah. . . . After you do so much stuff, like taking your medication, you can get off, you know?  You can get out on the grounds and stuff more.

Here, Billiot was asked how long he had been taking medication, and he told them he had taken it since he was at Mandeville when he was thirteen.  The question was posed again, asking whether there was a time since he had been at Parchman when he was not medicated, and Billiot said he had always taken it.  Dr. O'Brien reminded him of his earlier interview and said that he believed Billiot was not taking medicine then, but Billiot denied that.

His regular medication schedule was a constant theme in this interview.  When asked whether his pills hurt him in any way, Billiot replied, "No, and I always take them."  He denied any mental complaints or hearing voices, but admitted that his nerves were bad, until he got his pills.  According to Billiot, that condition did not often arise, because "I take my pills."

The experts then began to question Billiot about his daily routine, following which they administered some cognitive tests.  When Billiot finally objected to the tests, they immediately stopped.  He began fidgeting obviously, but the experts returned to the examination regarding his conviction and penalty:

Q.:     What exactly did the court say you did when they convicted you?

A.:     That was it; capital murder.

Q.: Okay - one?

A.: Three.

Q.: Three?  Did you have a jury trial?

A.: Yeah.

Q.: You said you received the death penalty as the result of that trial?

A.: Yeah, yeah.

. . . .

Q.: Now, you've been in Parchman a long time, on Unit 32.  Do you have any idea how long you're going to be there?

A.: No, I'm counting on my lawyer to come up with [unintelligible] rehabilitation, get back in court.

Q.: Put your case back in court?

A.: What I want to do is go back to a mental institution, go to a mental institution and just settle my nerves down for a while by taking my medicine, and then get back on the grounds, like, like I done that before.  Like I said, I've been in mental institutions since I was thirteen.

Q.: So, you'd like to get them to transfer you to some sort of mental facility away from Parchman, is that what you'd like?

A.: Yeah, until I can rehabilitate myself.  But I do take my nerve pills.

. . . .

Q.: If you're given the death sentence, for capital murder, do you know what you're automatically entitled to after the conviction?

A.: No.

Q.: There's something called an appeal.

A.: Oh, well, yeah.

Q.:     Tell me what your understanding of that is.

A.:     I don't know; it just goes into different courts, until a court decides that I get rehabilitation, and, if they don't want to do it, you know, well, they decide against me.

Q.:     And what happens if they decide against you?

A.:     Well, I guess they'll try to execute me one day.

Q.:     Do you know what kind of execution [unintelligible]?

A.:     Lethal injection.

Q.:     And I assume that's not something you want to happen.

A.:     No, no it's not.

Q.:     So, if your appeals don't work, at some point, they will execute you. Presumably with lethal injection. That's your understanding, if your appeals fail.

A.:     They can try to, yes. Mississippi.

Q.:     What would happen to you, if you were executed? Given lethal injection?

A.:     I really don't know, I'd have to appeal it.

Q.:     Is that something that scares you?

A.      No.

Q.:     How do you feel about that?

A.:     I guess, eventually, I'll be put in a mental institution, like I have before, and take my nerve pills for a while, then get back out to the free world, I guess. I don't know, get off my pills, I never have.

Q.:     So, if you and your attorney win your appeal, what happens next?

A.:     Well, then they'll probably put me in a mental institution, for a while, till ... my nerve pills, then I feel better.

Q.:   What would happen to your conviction then?

A.:   Well, it won't be . . . they won't have none.

Q.:   Do you think your conviction will just go away if you win your appeal?

A.:   Yeah, yeah.

Q.:   And then, what might happen then, if they drop . . .?

A.:   Well, I told you because, because I been through it before, I'll go to Whitfield or East Mississippi State Mental Institution.   After a while, I'll be rehabilitated, then you, you know, you get your privileges back, go out on the grounds and stuff, or go out to the free world.

Q.:   So, if you win the appeal, they, if the court reverses the conviction and you go to Whitfield, what would happen with your charges?

A.:   Well, they'll get rid of my charges then, I won't have no more.

Q.:   Could they bring them back and re-try you?

A.:   I don't think so, not if I'm being rehabilitated.

Q.:   They can, and they probably will.

A.:   I really don't know. [Pause]  I can only go so long, or else, I'm going to win one day one way or the other.

Q.:   So. your understanding is if you win your appeal, you'll be free and go some place like Whitfield and get some treatment and some rehabilitation.

A.:   Yeah, and finish off taking my pills for a while, you know, and I'll be able to get out.  I don't really [unintelligible] too much, but I take my pills, my nerve pills.

Q.:   But there's more than one way for them to, for your case to come out.  If you won an appeal,  there are two different things they could do.  One would be, they could throw your case out altogether, for various reasons, [unintelligible].  The other thing is they could throw the sentence out.  In other words, you'd still be convicted, but they could change your sentence from the death penalty to something else.  You understand that?

A.: Yeah, I understand that. This is, my best advice is, I'd like to go to the mental institution for a while is the best advice I can give you ....

Q.: Do you know what the other sentence might be, though, if they threw out your sentence?

A.: No.

Q.: It'd be, or the death penalty, or my understanding it would be life in prison.

A.: Yeah.

Q.: You might want to talk with your attorney about that, to clarify it, but that's my understanding of what might happen with your sentence.

A.: Well, I'm just trying to show you how to deal with mental .. with a person that has mental problems . . . . I'm just another patient, and that's why I've always got to go to East . . ., to a mental institution to let them, to let my nerves get better, you know. Then I could be rehabilitation [sic]. They got all that stuff, like you got that diagram down there, but I told them I don't do too much of that. When I been figuring for a while, so, you know what I'm talking about.

Q.: Is there anything about your case that makes it more likely that you're going to win your appeal, compared to somebody else in the same situation?

A.: Having mental problems.

Q.: Care to elaborate on that; tell me more about that? How is that going to help, compared to anybody else in the same situation.

A.: Well, I gotta go to a mental institution.

Q.: Is there anything about you that's going to make, if you lose your appeal, will you be treated any differently from anybody else who loses his death row appeal?

A.: I don't know; I don't think so.

Q.: If you lose your appeal, and they execute you, is there anything about you that would make you respond differently to execution than somebody else on death row?

A.:     No, all the same, I guess . . . . what did you say your name was?

Q.:     Montgomery.

A.:     Montgomery.  You from Mississippi?

Q.:     Yes, sir.

A.:     Where'd you say you were from, Tennessee, right? (To O'Brien)

Q.     Kentucky.

A.:     Kentucky.  I had a bet going on between Kentucky and Tennessee ..... (talk turns to football).

After this exchange, O'Brien posed several "standard" questions to Billiot, apparently designed to detect malingering.  Montgomery then asked Billiot questions regarding past delusions about Hitler and special religious powers, all of which Billiot denied, except for seeing spirits in old houses when he was young.  Billiot raised the issue of his nationality, and told them that he was French, German, and Norwegian. When discussing disciplinary issues, Billiot stated that he had a bad bladder, and had been trying to "get it taken out," but it was getting better.

Billiot denied any depression or suicidal thoughts; in fact, he said that he was happy all the time.  Later, when asked about his alleged victims, Billiot said they were his mother, his stepfather and half-sister and that he was convicted for killing all three.  As a final question, Billiot was asked:

Q.:     If you only had two possibilities, either having your death sentence carried out or spending the rest of your life on the row, which of those two . . . .

A.:     Pick the rest of my life on the row.

Q.:     How come?

A.:     I don't never want nobody to hurt me.

The day before the competency hearing was to begin, this Court ordered that Billiot be brought to the courthouse for a final evaluation by each of the expert witnesses. Petitioner's experts examined him first, each for half an hour, and their impressions will be discussed later. When Dr. Montgomery and Dr. O'Brien arrived, Billiot was upset at being asked "the same questions, over and over," and, although he was polite, he refused to speak with them.

After their 2007 interview, both Dr. O'Brien and Dr. Montgomery provided written opinions on Billiot's competency. O'Brien recognized that, based upon the M-FAST test he administered during the examination, Billiot was "accurately reporting his psychological difficulties." He assessed Billiot's understanding of his legal situation as follows:

> When asked about his current legal status he said he was convicted of "capital murder" of three victims, which he identified as his "mother, step-father, and half-sister." When asked if he received a fair trial he said he did not want "to talk about that." He was able to link his crime and subsequent trial with a "death" sentence. He currently resides in "D" building of "Unit 32" in the "mental ward" at Parchman. He was able to name his lawyer, and explained that he is currently working with him "trying to put me to work" by getting him transferred to a prison psychiatric treatment unit, such as one in Meridian. He is aware that he has a pending appeal of his death sentence, which would be carried out by "lethal injection."

Thus, Dr. O'Brien concluded, Billiot has a factual and rational understanding of the reasons for his impending execution. He stated, "It is my opinion that Mr. Billiot, despite his long and well-documented history of psychological/psychiatric difficulties, is currently able to perceive the connection between his crime and his punishment, is aware that this punishment is the death penalty, and that execution of the death penalty is approaching."

At the hearing, Dr. O'Brien admitted that Billiot has a long history of schizophrenic symptoms, and he testified that he does not doubt that the accounts of Billiot's behavior in his medical records are generally accurate. He reported that Billiot has always had difficulty focusing,

as well as disorganized thinking, and, from time to time, delusional beliefs. However, Dr. O'Brien said that the issue is not whether Billiot is schizophrenic or bipolar, but whether he meets the legal standard for competency to be executed. Noting that Billiot is able to talk about his specific case, but consciously seemed to avoid talking about his legal situation, O'Brien concluded that he was competent.

Dr. Montgomery is a psychiatrist at the Mississippi State Hospital, where he divides his time between forensic psychiatry and clinical duties. He also consults with several state agencies and has a private practice. Dr. Montgomery is board certified in both general and forensic psychiatry, and he has been accepted as an expert in forensic psychiatry approximately fifteen times. Dr. Montgomery also wrote a report of the 2007 interview. He recognized that Billiot had a long history of mental illness – specifically, schizophrenia – that had been characterized by "disorganized speech and behavior, delusions, and poor self-care." He also admitted that Billiot's condition had deteriorated for many years. However, Dr. Montgomery believed that Billiot's medication regimen at the time of the interview had caused a remission of his schizophrenia. Dr. Montgomery concluded that Billiot was competent to be executed, noting that he was aware that he was on death row and that he had been sentenced to death for the murder of his family members. He also believed that Billiot had "the intellectual capacity and reasoning abilities to confer with his attorney, if he so chooses." Discussing Billiot's persistent assertion that he would be sent to a mental institution and ultimately released, Dr. Montgomery characterized as "an unrealistic degree of optimism about his appeals" that, while "misguided and irrational" was not the product of a delusion. At most, Dr. Montgomery believed that Billiot's psychotic disorder might prevent him from having a realistic understanding of what would happen if he won his appeal.

During cross-examination at the hearing, Dr. Montgomery was asked about the decision to interview Billiot together with Dr. O'Brien. He explained that the decision had to do with logistics – unlike the interviews with Drs. Gur and Johnson, both of which occurred at Parchman, the interview with Drs. O'Brien and Montgomery occurred at the Central Mississippi Correctional Facility in Rankin County. Because Billiot had to be transported to and from Parchman, there was limited time for the interview.

Billiot's attorneys questioned Montgomery at length about the amicus brief filed jointly in *Panetti* by the American Psychological Association, the American Psychiatric Association, and the National Alliance on Mental Illness. That brief referenced works recommending certain techniques for competency interviews that differed from those used by O'Brien and Montgomery. Specifically, one of the articles recommended informing the prisoner in advance of the nature and purpose of the interview. Montgomery thought that they had complied with the first suggestion; the tape of the interview reflects that they informed him that they had been asked to discuss his "legal case," in particular, his understanding of his current legal situation. They informed him that his participation was voluntary and that he could refuse to answer any question. They also told him that what they discussed would be written and submitted to the court. The article also recommended talking with family and friends, which Montgomery did not do. It recommended speaking with correctional officers; Montgomery testified that they spoke with the transporting officers. However, this cross-examination did nothing to alter Montgomery's conclusion that Billiot was competent.

Dr. William Johnson, who testified on Billiot's behalf, is a professor of clinical psychology at The Citadel. Prior to his employment there, he was employed in the Department of Psychiatry at the University of Mississippi Medical Center. He was also a consultant at the Mississippi State

Hospital, and, in connection with that employment, Dr. Johnson interviewed Billiot on several occasions. The first interview was in 1981, when Billiot was evaluated for criminal responsibility and competence to stand trial at the State Hospital. At Billiot's original trial, Dr. Johnson testified that Billiot was not criminally responsible, although he believed that he was competent to stand trial if carefully instructed by his attorney on how to behave. Since the state court competency proceedings, Johnson has interviewed Billiot in August, 2001; January, 2003; January, 2008; and on June 24, 2009. According to the medical records, the first visit occurred during a time when Billiot had not been medicated since the Haldol shots in December, 2000; however, Billiot told Dr. Johnson that he had received anti-psychotic medicine one to two months before. He appeared clean and neat and was cooperative and open. Johnson's assessment of Billiot's behavior follows:

> He was oriented to person, place, and time although he displayed very frequesnt looseness of associations, flight of ideas, and a general inability to engage in meaningful, social discourse. There was little or no conventional logical connection while he was speaking. Furthermore, his responses were often tangential and circumstantial. The content of his thoughts ranged from being appropriate to very bizarre, irrational beliefs which he could not clarify. He was alert, yet could not engage in abstract thinking, and his cognitive processes are markedly impaired.

Dr. Johnson concluded that Billiot was not competent to be executed, noting:

> He does objectively know that receiving the death penalty means that one will be executed but he cannot relate that to his own plight – again referring to the fact that it his word versus "theirs". His distortion of reality is readily apparent when he talks about resuming a life in New Orleans in the near future.

> That opinion did not change after the 2003 interview, where Billiot's behavior had not improved, and, in fact, may have worsened in comparison with the earlier examination:

> He spoke in a pressured, rambling manner, and his thoughts were very disorganized with no logical connection between ideas. Most of his responses to questions were irrelevant, and he had to be continually reoriented to the topic at hand. The content of his thoughts was very irrational and bizarre, and these thoughts were distinguished

for their delusional quality as he engaged in irrelevant dialogue and claimed secretive, satanic powers. When pressed to clarify a bizarre thought, he would not – becoming defensive, refusing to elaborate, and frequently rambling on with incomprehensible musings. Mr. Billiot denied experiencing hallucinations, but he was very distractible. He was oriented to person, place, and month but not year. Mr. Billiot was alert on abstract tasks requiring a minimal degree of effort; however he refused to attempt tasks that required more concentration and directed thought. His immediate and remote memory appeared grossly intact, but they are compromised by his delusions. His insight and judgment were extraordinarily poor and non-apparent. Mr. Billiot has a general inability to engage in rational, meaningful social discourse. Throughout this evaluation, he engaged in a logic that is unique, idiosyncratic, and unintelligible.

Again, Dr. Johnson found him incompetent, concluding that Billiot "displayed a complete inability to understand the gravity of his legal situation and the fact that he has been given the death penalty pending his appeal."

Dr. Johnson's next interview with Billiot was in January, 2008, and the videotape has been reviewed by the Court. His appearance was not as neat as it had been with Drs. Montgomery and O'Brien. One of Billiot's initial statements to Dr. Johnson was that he was taking his medication every day. He denied earlier hallucinations and destructive behavior, including flooding. Billiot remembered being stabbed by another inmate, but he did not know why he was attacked. He was reluctant to discuss his conviction, insisting that Johnson already knew the details. Billiot related that he had been found guilty and sentenced to death, but kept stating that he should have been sent to a mental institution. He did not remember anything about the murders except that they occurred on Thanksgiving. When Johnson attempted to talk to Billiot about his former destructive behavior, Billiot became very agitated, insisting that he never did anything like that. He also could not remember a time when he was not given his pills. In his report on this interview, Dr. Johnson again concluded that Billiot was not competent to be executed.

According to Dr. Johnson, Billiot attempts to control his symptoms, in the belief that, if he appears normal, he will be transferred to a state hospital for rehabilitation and release. However, that veneer of control is penetrable. Johnson interviewed Billiot a final time the day before the hearing in this Court. Johnson characterized Billiot as much more disturbed than in the previous interview. Although the first few minutes were cordial, when Dr. Johnson asked Billiot about his execution and what would happen, "[T]hat's when he became very excited, loud, boisterous, got up and paced, talked about his power, his invincibility, and so on." Asked what Billiot said about his power, Johnson said, "That it wouldn't happen, that he is very strong . . . . And then he brought in the stabbing and the fire[8] and so on as an illustration of his ability." Although Billiot was aware that the method of execution was lethal injection, "his concern was with the pain, and he is not going to be harmed, he is not going to get hurt, and it is not going to happen to him." He also knew that another inmate had recently been executed, but stated that the execution was not relevant to him because of his power. Finally, Dr. Johnson said, Billiot became highly disorganized with his thoughts and speech and began yelling obscenities "at me and my deceased parents and so on."

Based on these responses, as well as his earlier interviews, Dr. Johnson concluded that Billiot does not have a rational understanding of what will happen to him when he is executed. He also believes that Billiot does not have a rational understanding of the crime for which he was convicted. Dr. Johnson bases that opinion on Billiot's changing recollection of the crime. Immediately after the murders, he admitted that he committed them, but explained that the devil "had put an omen down," and there were witches in the household, so he had to kill them. A few years later, Billiot

---

[8]In November, 1982, twenty-nine inmates were killed in a fire at the Harrison County Jail. Apparently, Billiot was being held in the jail at that time, awaiting trial.

would only admit that "they say" that he committed the crimes. Johnson does not believe that this change in story is voluntary on Billiot's part, but that he is unable to personalize his actions to the murders.

As stated earlier, Dr. Johnson does believe that Billiot can control, to some extent, the reporting of his symptoms; therefore; he can answer cursory questions about his state by denying hallucinations or delusions. The truth of his condition can only be ascertained by asking penetrating or challenging questions, particularly if Billiot denies a symptom that has been well documented. Johnson believes that this sort of questioning is an appropriate evaluative technique, although it might not be helpful in a treatment situation, particularly in a volatile prison setting. The fact that Billiot's condition fluctuates and he appears less psychotic at some points in his history is likely attributable to external factors, such as stress levels and medication. However, his condition is essentially unchanged, as is Dr. Johnson's opinion that he is incompetent to be executed.

Dr. Raquel Gur, a psychiatrist retained by Billiot's counsel, examined him in 2001, 2008, and the day before the hearing. Dr. Gur is the Director of the Schizophrenia Research Center in the Neuropsychiatry Division in the Department of Psychiatry, University of Pennsylvania, as well as the Vice-Chair for Research Development in the Department of Psychiatry, University of Pennsylvania School of Medicine. She provided a written report of her first two meetings with Billiot, and she testified at the competency hearing in this Court about the third. Her conclusions about Billiot's mental status after the first meeting, in 2001, follow:

> It is my conclusion that Mr. Billiot can repeat what other people say, that he is "on death row" but he has no rational understanding of what that means – i.e., he does not think he will be executed, and or does not think he will die. Therefore, he fails to understand his impending execution and he does not grasp the fact that his execution means he will die. That is, he believes after he is "executed," he will go

to Louisiana in the same form as he is in today. Based on my evaluation of his behavior during the course of three hours, and on my review of his records, I have no ground to suspect that Mr. Billiot is malingering, or that his fund of knowledge is so impoverished that he does not, in the abstract, understand the idea of death. Rather, it seems that his inability to grasp the fact that he will die is a feature of his pronounced thought disorder and grossly psychotic state. Notably, Mr. Billiot does not comprehend the reason for his impending execution. He does not seem able to grasp that he is responsible for the death of three family members. He knows that other people say he killed them, but he cannot understand what this means, since he is not at all sure what happened to the victims, and in fact, seems to doubt that they are dead.

Dr. Gur examined Billiot again in February, 2008. He was not as neat as in either of the previous interviews; his beard was somewhat scraggly. In contrast to Billiot's relatively relaxed demeanor at his interviews with Drs. O'Brien, Montgomery, and Johnson, he became angry, to the point of incoherence, during his interview with Dr. Gur, and ultimately demanded to be taken from the interview room. This event occurred well into the interview, after Dr. Gur had asked him some questions about his conviction and his incarceration on death row. As with the other interviewers, Billiot repeatedly stated that he takes his medication, and he denied any previous hallucinations or destructive acts. Specifically, when Gur asked him about his comments on Hitler and special powers, Billiot denied making them, saying "I never done nothing like that before. Must be somebody else; it's not me." He went on to say:

Somebody talking about Hitler, this is ... this is the Confederate States that I live in, I'm proud of my heritage, you know, thirteen states underneath the Confederate States, this is the thirteen Confederate States . . . you know, they can still say it, since the Civil War. You know, all the rows back there are painted gray, you know, blue and gray, you know. Blue was the North, you know. But I, far as Hitler, I be German; I'll be German. But, like I was saying, you know, it ain't nothing, nothing than that, you know, you couldn't use that, good side also, you know, other than the bad side.

Dr. Gur asked, "What do you mean?"  Billiot replied, "Well, it's just, it would just be thirteen states. Used to be the South, the Confederate States, back in 18th Century.  As far as Hitler, I was German, also, but I was born down south, in the Confederate States."

At that point, Dr. Gur returned to her questioning about his understanding of his legal situation, and the remainder of the interview follows:

Q.:     So, if we go back to, you know, you're telling me that you don't want to talk
        about the details, but you are here for the death of your mother, stepfather,
        and stepsister, correct?

A.:     Half-sister.

Q.:     And step – yes, half sister; correct?

A.:     Yeah.

Q.:     Okay.  And what's going to happen to you?  You've been in prison now for
        –

A.:     I can't predict the future.  I don't know, you know, I'm trying to get through
        – I'm trying to go further in my rehabilitation – when I get back to the mental
        institution and go ahead and finish taking my medication and stuff, and just
        relax, you know, try to do some different types of work, you know, cause I
        used to work jobs when I was on the streets.  I worked back in Louisiana.  I
        like to see things.  I like – when I take my medication.  After a while I drink
        coffee and smoke, you know, I like stuff like that and –

Q.:     Okay.  Do you understand that you are on death row?

A.:     Yes, yes.

Q.:     What does it mean to be on death row?

A.:     Well, that's where you're going off, you know, you was talking about that.
        Why do I understand that, why do you ask – why do [inaudible].  What was
        his name right there again?

Q.:     Dr. Johnson?

A.: Johnson. Dr. Johnson, yeah.

Q.: Yes.

A.: Well, some type of [inaudible] – why do you ask the same thing over again. Why, you know, do I understand that I am on death row. Well, this is the State of Mississippi, they prosecuted me.

Q.: Okay. I just –

A.: I'm not from Mississippi originally. I'm not born here. I'm from Louisiana.

Q.: Okay. I understand, but it is important Dr. Johnson asked you some questions that are similar maybe to the questions that I ask you, but it is important that you –

A.: But it don't seem like anything to me, because like I'm saying, you talk about the same thing, do I hear voices and Hitler and stuff. I said no. I'm not into nothing like that.

Q.: Okay.

A.: Back when I was on the streets and I was younger, I worked and stuff for a living.

Q.: Okay. Uh-huh.

A.: Done hard work.

Q.: Uh-huh. So you understand that you are on death row? What happens to people who are on death row?

A.: Well, a lot of things happen to them. They get out of here. They get off death row.

Q.: How?

A.: Not just in here but, they hear voices and stuff.

Q.: Okay. So you –

A.: Or something is wrong.

Q.:     Okay.  So you say some people –

A.:     A bad vibe, you know, a bad vibe.  Some person that mentally ill they talk about them being schizophrenic or paranoid, and just different stuff like that.

Q.:     So you say that some people who are on death row might get off because?

A.:     I don't know.  I'm not – I can't predict the future, I don't know what they might do.  Just like I'm saying, if they will take the medication.  Medication will help.

Q.:     But –

A.:     That's what I can say.  Medication will help.

Q.:     But you are – you are on death row?

A.:     I just told you.  If you take your medication, you might get out of here.

Q.:     How will you get out of here?

A.:     If you are feeling better.  If you rehabilitate.  It's all about feeling better.  If somebody didn't take their medication, they might get mad and harm somebody.

Q.:     Have you ever heard of somebody or you on death row, who has gotten out?  You said there's a possibility.  I want you to follow the possibility.

A.:     I don't know.  I would have to get back and study all of that.  I'm not really in that mood right now.

Q.:     Okay.  You said sometimes people on death row get better?

A.:     I am trying to get to a mental institute.  It will be a better source of medication.

Q.:     Do some people –

A.:     Just get better help.  It's just a better source of medication.  It's made into a liquid or something, you, know, Valium, so I can sleep at night.

Q.:     Uh-huh.

A.:     Something like that.

Q.:     Some people on death row don't make it out of here.  What happens to those who don't make it out of here?  What do they –

A.:     I don't know.  I'm not – I can't predict what somebody else might do.  The inmate – he has to make his own judgment, you know?

Q.:     What – What does it mean to be on death row?  I'm going back to the question.  What does it mean to be on death row?

A.:     Well, they give you the death sentence in the State of Mississippi.

Q.:     They give you the death sentence.  Okay.  What does it mean to have the death sentence?

A.:     Well, we got an appeal, you know, going to the different courts and appeal and appeals might turn it over.  The appeal might overturn our case.

Q.:     Okay.

A.:     You know, and give somebody just a life sentence.

Q.:     What happens?

A.:     Lots of things.  Lots of things.

Q.:     Okay.  What happens when there's no appeal anymore?

A.:     What?

Q.:     What happens if there's no appeal anymore?

A.:     Well, then there's an execution.

Q.:     Okay.  What does it mean to execute?

A.:     Mississippi.  Mississippi.  State of Mississippi.

Q.:     So what does it mean to execute?

A.      The State of Mississippi to carry out justice.

Q.:    To carry out.  What does it mean?  How to carry out the judgment?

A.:    I can't go on for all of that.  You're going too far.  you're going a little too far.

Q.:    Well, what went way too far?  I just want to make –

A.:    I don't know, you just –

Q.:    I want to make sure that you understand what are the possibilities that you --

A.:    Why do you want to know that?  As long as I take my medication –

Q.     No –

A.:    – I feel better myself.  I don't feel like harming anyone.  Like I said, I take my medication, and I'm all right.

Q.:    But that's not the point.

A.:    I'm not somebody else.

Q.:    I understand, but that's not the point.  The point is if you understand what might happen to you when you're executed.

A.:    Yes, I understand that.

Q.:    What will happen?

A.:    I will be dead.  That's all.

Q.:    What does it mean to be dead?

A.:    That's it, you know.

Q.:    What happens to people when they die?

A.:    I don't know.  I can't go any further.  You are going a little bit too far.

Q.:    I understand.  Try.  You have to go far a little bit with me.  What happens to people when they die?

A.     I don't know.  I can't go that far.

Q.: I know you –

A.: I can just tell you that. I can't go any further.

Q.: Okay. One of the things that you were saying is that you are hoping that you will take the medication, you will rehabilitate, and you will be able to leave prison.

A.: Be free. Yes.

Q.: Do you know if you die, you will not be able to leave prison? Do you understand that?

A.: Well, I feel okay about myself, you know, as long as I take my medication I feel like I can get out of here. I'll get off.

Q.: And if not.

A.: That's me. That's my opinion.

Q.: Okay. But if I tell you that –

A.: I wouldn't believe it. I wouldn't believe it if you told me, "No, I was wrong," because I had my chance – my chance to take my medication and get out of here and feeling better. Somebody else, they believe I hear voices and Hitler and stuff and, you know, that's somebody else. That's not me.

Q.: I understand, but I want to make sure that you understand --

A.: I take my medication. That's why I feel good.

Q.: You take the medication –

A.: That's why I feel good. I feel good most of the time. I take my medication.

Q.: You take your medication because –

A.: I take it once in the morning time. I drink coffee and stuff and sit back and drink a cup of coffee and relax and drink me a cup of coffee.

Q.:    You take the medication because it makes you feel better, because without the medication you know the shaking, and you don't feel well. The medication helps you out to sleep better, you feel better, you just all the –

A.:    Wake up in the morning time I get my medication. I take one pill. I let it settle down about a half an hour. I get me a nice big cup of coffee in, and I eat breakfast, and I sit back and relax and drink coffee for a while.

Q.:    But –

A.:    Might sip on it for about half an hour.

Q.:    Do you understand that when you take your medication then your nerves are better?

A.:    Uh-huh.

Q.:    You're better and then the State can judge to execute you because you're ready, you're better.

A.:    Well, I can't worry about that. I can't think of my points like that. I don't – I think about getting better and, you know, you know, not being in any trouble. Yeah. That's the way I look at it.

Q.:    I understand.

A.:    Because I was free. I got to be free everyday from my medication.

Q.:    I understand what you're telling me, and I'm trying to see if you can understand. I know it's difficult to do. I understand.

A.:    If I didn't take my medication, that's when I wouldn't be cured. I might harm someone, might feel bad.

Q.:    But you understand –

A.:    Once I take my medication then I feel good, and I'm all right after that, you know.

Q.:    But if you're –

A.:    Bad things leave, you know, bad feelings might have been a thought or something bad I might – if I had a TV – I don't have a TV. Watching the

war, you know, they say a soldier got killed the other day or something like that. A bad feeling.

Q.: It's difficult.

A.: I believe that soldiers had a duty of going overseas. I believe they should have went overseas and duty of jacking somebody up – attacking the United States and destroy something.

Q.: What do you mean? Who should have gone overseas?

A.: The soldiers.

Q.: What soldiers?

A.: The United States soldiers. Army

Q.: How did they come into the picture?

A.: I just told you I was watching something on TV. I don't have a TV right now, and there's something that was a bad feeling one time when they attacked the World Trade Center, like I said, I don't want to get up there and start hollering Hitler and hearing voices, you know, because a soldier went over there and checked that out to see if they were trying to do it on purpose, a bad feeling or something.

Q.: Uh-huh. The soldiers are trying to do what on purpose?

A.: Not the soldiers. The person that was doing. The soldiers went over there to try to prevent them from doing –

Q.: Uh-huh. I'm trying to follow. I'm trying to follow. How did you get to what you are talking about with the World Trade Center to what we were talking about? You were talking about if you are – I'm trying to follow you, to be with you, to understand. It's not easy. I understand that, appreciate that, but you were saying that you don't have a TV in your room and without the medication if you sit there, you will feel bad.

A.: Yeah. While I was watching TV, you know, I was saying I would probably feel bad if I heard a soldier wounded in battle or something.

Q.: Yeah.

A.:     But I can't go off into all that.

Q.:     I know.

A.:     That's just another trip [inaudible] I don't like to feel bad.  I take my medication to feel good.

Q.:     But do you understand you're in a tough choice, because if you don't take your medication you will feel bad, but if you take the medication you will feel better but you might be executed.

A.:     Well, I have to take that chance.

Q.:     You have to take that chance?

A.:     Yes.  If I quit get my medication, I will be feeling bad then, you know?

Q.:     Uh-huh.

A.:     I don't want to suffer.  That's the way I believe.  I believe I will stay on my medication, and I won't be executed.

Q.:     What makes you believe this?

A.:     Because that is my right.

Q.:     What makes you believe?

A.:     I take my medication.  That's why I don't have bad feelings.

Q.:     I understand.

A.:     As far as Hitler and hearing voices, you will have to talk to somebody else about that.

Q.:     Uh-huh.  So you rather take the medication and die, then not take the medication?

A.:     No, I don't believe in that right there.  I believe in living afterwards.  I believe if I take my medication –

Q.:     How will you live afterwards?

A.:      Well, I just would.

Q.:      How?

A.:      Just live on.

Q.:      How will you live on?  How will you die and live on at the same time?

A.:      I won't die.  I won't die.

Q.:      How do you know that?

A.:      Are you about through?

     THE WITNESS:      Reggie, I can't go on?

A.      You want to change this around.  You know what I'm talking about.  Like I'm saying.

Q.:      Sit down.  Sit.  Sit.

A.:      My medication is fine.  If I don't take my medication –

Q.:      Okay.  Sit.  Sit.

A.:      – then I'm through.

Q.:      Then sit.  Sit.  Wait.  Wait.  Wait.

A.:      Get me out of here, because I am through.

Q.:      Wait a minute.  Wait a minute.

     THE WITNESS:      Are you going to do this or not, because I am through now.

Q.:      Wait.  Wait.

     The WITNESS:      Take it off.  I am through.  I'm through talking.

Q.:      Can you sit?

     THE WITNESS:      Do you want to take me out or not?

Q.:     Can you sit down for a minute?

A.:     No.  No.  I can't talk anymore.  I got to go.  I have to go back to my cell.

Q.:     Just relax.  Relax.

        THE WITNESS:        Don't listen to her.

Q.:     Okay.  Okay.  Well, you know I want to help –

A.:     Now, you're getting me angry right now.  If you don't cooperate with what – me right now I go to go to the bathroom.

Q.:     I don't want to get you angry.

A.:     None of my business.

Q.:     I don't want to – okay.

        THE BAILIFF:        Let me get the transport.

        THE WITNESS:        Just take this off and take me on back.

        THE BAILIFF:        I need the van.  I ain't got the van.

Q.:     I want to talk about something else.  I don't want to get you angry.  Okay?

A.:     Like I said –

Q.:     I want you to calm down and not get angry.  Okay?

A.:     I'm through talking.  Like I said, you know, I ain't got no more talk.

Q.:     Okay.  That's okay.

A.:     You're going to have to find somebody else living in your world, you know, living in here hearing voices Hitler and stuff.  I don't play those type of games.

Q.:     Okay. Uh-huh.  Uh-huh.

A.: I take my medication, and I'm fine. There's no way I'm getting off my medication.

Q.: I understand. I understand, and I respect that. It's a choice that you have made, and I understand.

A.: One day when you find your own reality, you can come back and talk to me in a nicer way. You don't come around sitting around with that nasty look. Like you out of it, you know, cause I don't mess around like that.

Q.: I understand.

A.: You better find somebody else. Be your own psychiatrist, like I'm saying, I feed myself. I work for a living back in Louisiana, and I don't mess with somebody.

Q.: Okay. I'm sorry.

A.: Like I said I am going back to Louisiana one day. I'm going to take my medication, and I'm going to go back to work down there. I ain't coming back here so you can mess around, like I'm saying.

Q.: Mr. Billiot, Mr. Billiot, listen to me. I am sorry. Okay. Have a seat. I am sorry.

A.: No, no, I have to go. I want to go back to my cell. I'm through talking today. Find somebody else to talk.

Q.: I don't want you to leave so upset. Okay?

THE WITNESS: Do you want to take these off?

Q.: I do apologize, and I don't want you to leave.

A.: You don't have to apologize, but like I'm saying, I'm fine. I just want to go back right now. Talking about all kind of stuff like this. Talking about Hitler and all stuff like this.

THE BAILIFF: Sit down. Let me get these off.

A.: You want and try and mess with me like that, no, no, you ain't going to mess with me like that.

Q.:     Thank you.  Bye.

A.:     Okay.  Okay.

In her post-interview report, Dr. Gur noted Billiot's improvement with anti-psychotic drugs;

however, she believed he was not in remission:

> Rather, he is able to maintain a thin façade of "well-being" because of the effects of the antipsychotic agent.  This thin layer of composure cracked under discussion of his previous symptoms, and he decompensated when we attempted to discuss the real anticipated consequences of his situation.  He manifested significant thought disorder similar in extent and content to what had previously been observed by several experts.  His termination of the interview with me indicates that he is unable to assist an expert sent to him by his attorney.

She concluded:

> While Mr. Billiot knows he is in prison, on death row, for the murder of three family members, he has no rational understanding of the consequences of the impending execution.  Furthermore, while recognizing that he is mentally ill and that the medications help him with his "bad nerves," he denies all psychotic symptoms and makes an effort to present himself as doing well in the false belief that this will lead to his eventual discharge.  He is convinced and adamant that if he stays on the medication, everything will turn out well, and he will end up in a mental hospital before returning to the community.

> What may be perceived as Mr. Billiot's "optimistic belief," as noted in Dr. Montgomery's report of December 26, 2007 (p. 8), is rather a known symptom of psychosis, which is denial to the point of a break from reality (i.e., anosognosia).  He denies not only the severity but also the existence of any residual symptoms while on medication.  He does not feign insanity; he feigns sanity.  This denial prevents him from fully appreciating the circumstances of his execution.

> Based on my evaluation of his behavior during the course of the most recent interview, and considering his medical history, I conclude that while Mr. Billiot appears clinically improved while taking an antipsychotic, I observed symptoms of a psychotic disorder when agitated.  Based on my medical experience and the literature on the course of illness and treatment response of patients who suffer from severe schizophrenia, I believe that Mr. Billiot would decompensate and regress without antipsychotic medication.  As manifested in his previous clinical presentation, when off antipsychotics, he was agitated, thought disordered to the degree of incoherence, with bizarre behavior including smearing feces, and catatonia.

When on medication, upon initial interaction he can maintain the appearance of a sane individual who can interact appropriately and respond to most factual questions. However, when confronted with questions pertaining to his previous symptoms or the finality of execution, his composure disintegrates, symptoms resurface, and he demonstrates lack of a rational understanding of his options. Further efforts to try and clarify his understanding of his treatment and legal options resulted in my dismissal. Thus, notwithstanding his current antipsychotic regimen, in my opinion Mr. Billiot is not competent to be executed.

As stated earlier, the experts for both Billiot and Respondents were given an opportunity to interview him on the day before the competency hearing. At that time, Billiot told Dr. Gur that he believed that the Louisiana and Mississippi police "have set him up to accuse him of the murder, and that the truth is going to come out, he is going to fight for it, and that's part of what the hearing is about." He also told her that he was Jesus Christ, and somebody was trying to take his power away. When she persisted in the interview, he became agitated and demonstrated new behaviors that she had not previously observed – stomping his feet and making clicking sounds. He told her that he might be trained to sing, so that he could work in New Orleans, where he belonged. Dr. Gur thought that there was a more clear expression of some of his delusions in that interview.

To prepare for her testimony, Dr. Gur prepared a timeline of Billiot's reported behavior, along with his medication history for those periods. In reviewing the entirety of his medical history, she characterized his condition as deteriorating over time, although he had some periods of improvement. According to her, about a third of the people diagnosed with schizophrenia will show fluctuation and some improvement, although not to the level of pre-onset of the illness; about a third will remain stable with treatment; and about a third will continue to deteriorate. She believes that Billiot "is more among the third that shows continuous and progressive impairment with some fluctuation . . . ." Later, during cross-examination she described his condition as "refractory," in that,

despite treatment, he has been in a persistent psychotic state, such that his symptoms have not ameliorated enough for him to function better. Even with medication, she believes that his condition "has not dramatically changed over the years." Given the early onset of the condition and the consistency of his symptoms over many years, she felt that his prognosis was very poor.

In explaining her conclusion that Billiot is not competent to be executed, Dr. Gur recognized that he was able to relate that execution was the ultimate result of failing in his appeals and that being executed meant death. However, she does not believe that his ability to respond in that fashion to those questions indicates that he has a rational understanding that he will be put to death. Instead, she described Billiot's understanding of his future as follows:

> [H]e believes that he has the power and ability to go beyond death, that death is not something that he understands will apply to him. In other words, that when a person is executed, what happens to a person, a person is executed, they die. What will happen to you when you're executed? I'm going to find a job in New Orleans. I take the medication, I'm able to work, and if I can do that, I will be going back to New Orleans. And at this stage, when trying to pursue further, what do you mean, you know, if you die, what will specifically happen to you, he becomes very psychotic, and he stopped the interview. The guards had to come in and took him to another room, and he was mumbling, and after a break he refused to continue. . . . His notion of death and penalty is very abstract and doesn't enable, doesn't provide information to me that he understands the consequences of what he did and what death means to him in person.

She also pointed out that it was not his illness that determined his competency, but the severity of his psychotic state, which prevented him from having the ability to rationally interpret and anticipate the outcome of his case.

In their reports and during their testimony, Respondents' experts gave their own opinions about Dr. Gur's interview and her conclusions. Dr. O'Brien, who testified for Respondents, explained the difference in Billiot's behavior between his interview and Dr. Gur's as caused by

pressure from persistent questioning on the same issues. He reviewed the video of Dr. Gur's interview, and he interpreted Billiot's response as that of an individual who is powerless to quit talking to a persistent interviewer. Although O'Brien agreed that sometimes a mental health professional has to be persistent in asking questions, he believes that the interviewer risks getting information that is not relevant or pertinent. O'Brien realized that, by asking Billiot over and over about death and dying, each interviewer got different answers; however, in his opinion, none of those responses rose to the level of not having a rational understanding of crime and penalty and connection between them.

Dr. O'Brien further disagrees with Dr. Gur's use of what he characterized as a clinical approach to reaching her conclusion. For example, Dr. O'Brien would never ask some of the questions she asked, because they are more appropriate for a clinical setting than a forensic setting – e.g., "What does death mean?" Because Billiot does not like talking about his execution, those questions cause him to become agitated. According to Dr. O'Brien:

> Particularly, he doesn't like talking about dying, so there are two possible approaches. One is to ask questions which pretty much cover the territory and not, shall we say, irritate him to the point where he will not longer talk, or the other method, as used by Dr. Gur and also by Dr. Johnson, which is to repeat the questions over and over again, which I don't find particularly useful, so I didn't do it that way.

Dr. Montgomery also disagreed with Dr. Gur's conclusion that Billiot's denial of psychotic symptoms prevented him from being competent to be executed. Nor did he believe that Billiot was delusional during the interview, because Billiot is normally overtly psychotic when he is delusional. Dr. Montgomery believed that Billiot's belief that he would be transferred to a mental hospital and ultimately released was not delusional, but was based on conversations with members of the Parchman treatment team, who had discussed with him the possibility of transferring to the East

Mississippi Correctional Facility, which is the psychiatric facility for the Mississippi Department of Corrections.

As stated earlier, during Dr. Montgomery's cross-examination, Billiot's counsel asked several questions regarding recommendations made in an article cited in the amicus brief filed in *Panetti*. One of those recommendation was, "Ask questions about death from a number of different angles (e.g., meaning of death, specific understandings about death from execution), so as to facilitate a thorough evaluation of any irrational beliefs or ideas the offender may hold regarding death." Montgomery believed that he had done so when he asked Billiot what would happen to him if he was executed and whether he would prefer execution to life without parole. He testified, however, that he was trying "to ask questions around death, kind of dancing round the topic of death without scaring the person off . . . ." Montgomery admitted that his report states that, in response to being asked what he believed would be the ultimate outcome of his case, Billiot said, "Eventually, I will be put in a mental institution and get to the free world." Finally, Dr. Montgomery acknowledged that he did not question Billiot regarding his personal meaning of death. None of these admissions, however, changed his opinion that Billiot was competent to be executed. Thus, after conducting their own interviews and reviewing the interviews and reports of the other experts, Dr. Montgomery and Dr. O'Brien believe that Billiot is competent to be executed, while Dr. Gur and Dr. Johnson believe that he is not.

## ANALYSIS

*Panetti* holds that, consistent with the Eighth Amendment, Billiot may not be executed unless he has, at a minimum, a rational understanding of his conviction, his impending execution and the relationship between the two. As an initial matter, the court, having observed the demeanor of the

experts who testified and having examined their testimony, finds all of them to be well qualified, credible and sincere in their opinions. That being the case, it is not surprising that they agree on several points. In particular, they concur that Billiot suffers from severe, chronic schizophrenia, accompanied by delusions. However, their ultimate opinions on whether Billiot is competent to be executed differ; therefore, the court is compelled to credit one set of opinions over the other. To make this decision, the court has conducted its own review of Billiot's medical records and has considered its own observations of Billiot at the competency hearing. *See Paul v. United States*, 534 F.3d 832, 853 (8th Cir. 2008)("[I]t is not inappropriate for the court to consider its own observations of the petitioner, and even to disagree with experts on mental functioning where warranted.") (citing *Holmes v. Buss*, 506 F.3d 576, 581 (7th Cir. 2007)). The court has also compared the qualifications of the four experts who testified. *See Comer v. Schriro*, 480 F.3d 960, 970 (9th Cir. 2007). Based on these factors, the court concludes that Dr. Gur, whose qualifications in the field of schizophrenia research are outstanding, offered an opinion most in accord with the Court's observations.

Dr. Gur specializes in research and treatment of schizophrenia, and she directs a federally funded schizophrenia research center at the University of Pennsylvania. In addition to her teaching duties, she runs a clinic and treats patients. She has been a Council Member of the National Advisory Mental Health Council, which advises the Secretary of Health and Human Services, the Director of the National Institutes of Health, and the Director of the National Institute of Mental Health. She is also on the Advisory Board for the International Congress on Schizophrenia Research. Following her testimony before this Court, Dr. Gur attended the Ninth World Congress of Biological Psychiatry in Paris, where she was Co-Chair of the International Scientific Programme Committee.

Dr. Gur concluded that Billiot knows he is in prison for killing three family members, but that he no rational understanding of the consequences of the impending execution. His unalterable belief is that, as long as he stays on his medication, he will sent to a mental hospital for further treatment and ultimately will be released. In order to demonstrate his improvement on medication, he denies past psychotic symptoms, feigning sanity in order to further his goal of returning to New Orleans to work. When pressed on his unrealistic beliefs, his composure disintegrates, and he becomes floridly psychotic. According to Dr. Gur, Billiot's medical history demonstrates that he is among the group of schizophrenic patients who shows continuous and progressive impairment, although with some fluctuations. This view is further supported by Billiot's demeanor when she interviewed him the day before the competency hearing, where he expressed his delusions even more clearly, telling her that someone was trying to take his powers away. In her opinion, Billiot does not believe that death will happen to him, and he was unable to assist the experts sent to him by his attorneys.

Dr. Johnson, who has more experience with Billiot than any of the other experts, concurs with Dr. Gur's opinion, based both upon his observation of her interviews and also on his own examinations of Billiot over the course of over twenty years. Although Billiot attempts to control his symptoms, so that he will be sent to a mental hospital, Dr. Johnson found his veneer of control to be penetrable. In the final interview, on the day before the hearing, Dr. Johnson asked Billiot about his execution and what would happen. At that point, Billiot became boisterous and announced that the execution would not occur because he was invincible, as he had demonstrated by surviving the jail fire and recovering from the earlier stabbing. Dr. Johnson believes that Billiot is unable to

personalize his actions to the murders of his family, and he cannot rationally comprehend that he would be killed by lethal injection. Instead, he is more concerned about the pain of the shot.

The court has carefully considered the opinions of Dr. O'Brien and Dr. Montgomery, but is of the opinion that Dr. Gur's interview technique was the most appropriate for determining whether Billiot is competent to be executed. This belief is supported by the amicus brief filed in the United States Supreme Court by the American Psychological Association, American Psychiatric Association, and the National Alliance on Mental Illness in support of the petitioner in *Panetti v. Quarterman*, 531 U.S. 930 (2007), 2007 WL 579235. That brief was recognized by the Supreme Court as providing a guideline for experts performing competency determinations. 531 U.S. at 962. Citing several published resources, the brief provided the following suggestions:

> In the context of competency to be executed, the interview would begin with general, factual questions such as: "Why are you in prison?" and "Why have you been sentenced to death" After establishing the factual framework, the interview could be expected to address the examinee's rational understanding with questions like: "Will you be executed?" and "What preparations have you made in anticipation of your execution?" To the expert forensic psychologist or psychiatrist, the answers to these questions reveal the subject's mental capacities, and clarifying follow-up questions can probe ambiguous replies. In addition, the clinician will consult collateral sources of information, including prison personnel, family members, and attorneys, as well as the individual's treatment records and mental health history.

Brief of Amicus Curiae, *supra,* 17-18.

The court is persuaded that Dr. Gur's interview technique, which probed the depth of Billiot's understanding of his situation, was in keeping with prevailing mental health standards for a competency review, as recognized by the Supreme Court in *Panetti*. Moreover, in-depth questioning is particularly appropriate where the inmate is schizophrenic, as pointed out in the amicus brief:

Psychotic disorders such as schizophrenia distort the mind in certain ways while leaving other functions generally intact. As noted above, an individual with paranoid schizophrenia may possess "a relative preservation of cognitive functioning." DSM-IV-TR 313. Yet such a person, plagued by a delusional psychotic disorder, may have no ability to apply his cognitive functions to test the veracity of the conclusions that he draws; while the *process* of a person's thinking appears normal, the *content* of the thoughts defies accepted reality.

. . . .

Schizophrenic patients may be highly intelligent, certainly not confused, and they may be painstaking in their abstractions and deductions. But their thought processes are strange and do not lead to conclusions based on reality or universal logic.

Brief of Amicus Curiae, *supra*, 10-11. The brief used as an example a person with paranoid schizophrenia who believes himself to be Michael Jordan. Such a person could persist in that belief, even while admitting that he has none of Jordan's physical or personal characteristics. *Id*. With particular reference to Scott Panetti, in particular, the brief concluded:

Thus, a person suffering from schizophrenia or schizoaffective disorder may know that he has committed a crime; that the death penalty is imposed on persons who commit such crimes; and that the State has asserted he will be put to death because he committed that crime; and yet be absolutely and unwaveringly certain that his execution is not in fact a response to his crime but is instead an effort to prevent him from preaching the Gospel.

Brief, 11-12.

Given Billiot's condition, it was not enough to "ask questions which pretty much cover the territory" of his comprehension of his legal situation without irritating him, as was suggested by Respondents' experts. On the surface, Billiot can verbalize his understanding that he was convicted of the murders of his mother, stepfather and half-sister. He understands that he has been sentenced to death. Beyond that point, however, his cognitive functions break down, and that deficiency in reasoning might not have been readily apparent, but for Dr. Gur's interview. For example, when Dr.

Gur asked Billiot about his understanding of execution, he was able to answer, in a general manner, that it meant, "The State of Mississippi to carry out justice." He could not, however, personalize his response to involve his own death. When Dr. Gur pressed him on an answer, his demeanor changed. His face reddened, his voice thickened, and he told her she was "going too far" and repeated, as he had several times, that he was taking his medication. Ultimately, she was able to extract from him that, when he was executed, "I will be dead. That's all."

It is tempting to conclude from that one sentence that Billiot understands that his execution is imminent. However, follow-up questioning on the effect of death produced more resistance from Billiot, who announced, "I can't go that far." When Dr. Gur questioned his belief that he will leave prison for a rehabilitation program if he takes his medicine, Billiot told her he would not believe that an alternative result is possible. He then launched into an explanation of his daily medication and coffee routine. Dr. Gur tried to pull him back to the realities of his situation, noting that taking his medication could have the effect of hastening his execution. Billiot denied that possibility, and, almost instantly, began discussing the effect on him of hearing about soldiers' deaths on television. Dr. Gur asked him what relationship that had on the subject they were discussing, and Billiot gave a nonsensical answer:

> I just told you I was watching something on TV. I don't have a TV right now, and there's something that was a bad feeling one time when they attacked the World Trade Center, like I said, I don't want to get up there and start hollering Hitler and hearing voices, you know, because a soldier went over there and checked that out to see if they were trying to do it on purpose, a bad feeling or something.

Dr. Gur persisted, asking whether he understood that "if you take the medication you will feel better but you might be executed." Billiot argued with her, refusing to consider halting his medication. He said, "I believe I will stay on my medication, and I won't be executed." She responded, "So you

rather take the medication and die then not take the medication?" Billiot told her that he "believed in living afterwards," that he would "just live on." At that point, Billiot's voice thickened again, and he appeared to be near crying. He insisted "I won't die. I won't die." Following that statement, Billiot became extremely agitated and demanded to leave the interview. Despite Dr. Gur's repeated attempts to calm him and continue the interview, Billiot refused, saying, "I take my medication, and I'm fine. There's no way I'm getting off my medication." Finally, he told her, "Like I said, I am going back to Louisiana one day. I'm going to take my medication, and I'm going to go back to work down there. I ain't coming back here so you can mess around, like I'm saying."

All of the experts believe that Billiot suffers from severe schizophrenia. Both Dr. Gur and Dr. Johnson believe that this condition does not prevent Billiot from interacting appropriately on a superficial level and responding to factual questions. He can repeat that he is on death row for murdering three family members. However, his understanding of his impending execution is abstract. His actual, sincere belief is that he will be sent to a mental institution, rehabilitated, and ultimately set free *as long as he takes his medication*. This belief is evident even from his earlier interview with Respondents' experts. During that interview, almost any time Billiot was asked about the course of his case, leading to execution, he responded by saying that he takes his medicine. That belief is so entrenched that Billiot demonstrates marked emotional disturbance when it is challenged. Even in the interview with Dr. O'Brien and Dr. Montgomery, when asked how he would respond to being executed, he shifted the conversation to a discussion about football. Billiot simply cannot comprehend that he might be executed in spite of taking the medication, or even because of it.

Although there was not enough evidence for the court to accept that Billiot thinks himself invincible, due to his special powers, there was ample evidence that Billiot believes that showing

behavioral improvement will result in his being moved to a mental facility and released. The court finds that this conviction is not a misunderstanding of a conversation with prison officials, but a firmly held delusion. This delusion has the effect of compelling Billiot to deny or underplay his mental illness, even though the denial enhances, rather than diminishes, his chances of being executed. He not only feigns wellness, he feigns happiness, denying any sadness or depression, which is completely at odds with his situation. Billiot can maintain this facade of wellness during superficial conversation; it is only after intensive questioning of his delusion that this front cracks, and his psychotic state becomes evident. Billiot simply does not have the rational understanding of his impending execution that would make him eligible for the death penalty under the standard enunciated in *Panetti*.

These findings are supported by Billiot's medical records, the testimony of prison doctors who testified at his 1995 forced medication hearing, and the 2007-08 interviews conducted by the experts who testified at the hearing in this court. Billiot's appearance at that hearing, and the reports of the interviews that occurred the day before, demonstrate that his condition has not improved since the interviews and, indeed, has deteriorated. Such a deterioration is consistent with Dr. Gur's opinion that Billiot's condition will likely to continue to worsen, and his prognosis is bleak.

In *Ford*, Justice Marshall gave several reasons for the prohibition against executing the insane, including the questionable retributive effect of executing a person who does not understand why he has been condemned, the disinclination to execute a prisoner who cannot make peace with his conscience or his God, and society's "intuition that such an execution simply offends humanity." 477 U.S. at 409. All of these arguments are supported by Billiot's condition. He does not have a rational understanding that he will be executed; instead, he believes he will be released. Given his

delusional state, the court is convinced that Billiot would go to the execution chamber believing that he would not die. Other societal concerns acknowledged in *Panetti* also militate against sanctioning Billiot's execution. It is clear from Billiot's demeanor during the interviews and at the hearing that he cannot assist the experts chosen by his attorneys, nor can he assist the attorneys themselves. It is equally clear that, believing that he will not be executed, Billiot cannot prepare himself in any spiritual sense for death. It would be, as earlier writers have said, "uncharitable to dispatch [Billiot] 'into another world, when he is not of a capacity to fit himself for it.'" *Ford*, 477 U.S. at 407 (quoting Hawles 477). For all of these reasons, executing Billiot would not serve the retributive goal that justifies society's use of this punishment, and Billiot falls within the class of prisoners who should be excluded from the death penalty as incompetent.

## CONCLUSION

For all of the reasons given in this opinion, the court finds that James Billiot is not competent, under the protection against cruel and unusual punishment provided by the Eighth Amendment, to be executed, and the court so holds. His Motion to Determine Competency to be Executed shall be granted. Having made this finding, however, the Court must determine the appropriate relief.

Federal court are authorized to dispose of habeas petitions "as law and justice require." 28 U.S.C. § 2243; *Hilton v. Braunskill,* 481 U.S. 770 (1987); *Davis v. Reynolds,* 890 F.2d 1105, 1112 (10th Cir.1989). The mandate of the statute "is broad with respect to the relief that may be granted." *Carafas v. LaVallee,* 391 U.S. 234 (1968). Thus, a district court may exercise its broad authority in habeas cases to grant any relief it deems necessary, including, but not necessarily demanding, the

permanent discharge of a successful habeas petitioner. *Burton v. Johnson,* 975 F.2d 690, 693 (10th Cir.1992).

Under Mississippi law, the finding that a prisoner sentenced to death has become incompetent does not invalidate the sentence. Miss. Code Ann. § 99-19-57(2) (1972 & Supp. 2008). Instead, the statute provides that the prisoner should be committed to the forensic unit of the Mississippi State Hospital at Whitfield. While at the State Hospital, he will be regularly examined to determine whether there is a substantial probability that he will become sane within the foreseeable future and whether progress is being made toward that goal. Further, if it is determined by the appropriate official at the State Hospital that the prisoner has regained his sanity, the prisoner would be returned to the custody of the commissioner of corrections, and another competency hearing would be held.

Under the unique circumstances of this case, it would be inappropriate, at this juncture, to issue a writ of habeas corpus discharging Billiot from imprisonment. Instead, the court will require the appropriate officials of the State of Mississippi to suspend Billiot's sentence and transfer him to the Mississippi State Hospital under the provisions of § 99-19-57. If this is not accomplished within sixty days of the entry of this Memorandum Opinion and Order, then a writ will issue for Billiot's immediate release.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Petition for Writ of Habeas Corpus filed by James Billiot is hereby **granted** as to his claim that he is presently incompetent to be executed. A separate judgment will be entered, in accordance with Federal Rule of Civil Procedure 58.

IT IS FURTHER ORDERED that the appropriate officials of the State of Mississippi shall suspend Billiot's death sentence and transfer him to the Mississippi State Hospital under the provisions of § 97-19-57 within sixty days of the entry of this Memorandum Opinion and Order. Failure to do so will result in the issuance of a writ for Billiot's immediate release.

SO ORDERED this the 3rd day of November, 2009.

/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE